C. A. BURNAM and FLOSSIE BURNAM v. CHICAGO GREAT WESTERN RAILROAD COMPANY, E. E. CADWELL and LOGAN SANER, Appellants.—100 S. W. (2d) 858.

Division One, December 14, 1936.

26

*Brown, Douglas & Brown* for appellants.

28

*Shultz & Owen* for respondents.

BRADLEY, C.—Plaintiffs are husband and wife. Their minor son was injured in the yards of defendant railroad·at St. Joseph, Missouri, and this cause is to recover for loss of his services and expenses. The cause was tried to a jury, and the verdict was for

$15,000. On motion for new trial a *remittitur* of $5000 was made, the motion overruled and defendants appealed.

Jackie Burnam, aged five years, six months and nine days, at the time, was injured April 28, 1930. The cause was originally filed against the railroad company and Frank M. Cosgrove, engineer and in charge of the engine when Jackie was injured. The trial of the cause, as originally filed, resulted in a verdict in favor of plaintiffs for $5000. A new trial was granted and plaintiffs appealed to the Kansas City Court of Appeals, where the action of the trial court in granting the new trial was sustained. [Burnam et al. v. Chicago Great Western Ry. Co. et al., 54 S. W. (2d) 471.] Thereafter, a third amended petition was filed in which defendants, Cadwell and Saner, were added as defendants. At the beginning of the trial, record of which is here, plaintiffs dismissed as to defendant Cosgrove. Defendant Cadwell was foreman of the switching crew and defendant Saner was a member of this crew.

The railroad yards lie east of a public alley running north and south. West of the alley, and distant the length of the intervening lots, is St. Joseph Avenue. Woodson Street, an east and west street, intersects this alley a short distance north of the point where Jackie was injured, and passes over the yards on a viaduct. The next street south of Woodson is Richardson. There were ten tracks in the yards and Jackie was injured on No. 10, the west track and the one next to the alley. The alley on the plat is twenty feet in width, but the railroad right of way line is eleven feet west of the west rail of track 10, which made what is commonly referred to in the record as the "alleyway" about twenty-eight feet in width. The alleyway was some higher than the tracks, but there was a space of some two or three feet between the west rail of track ten and the east line of the alleyway. Houses, facing west on St. Joseph Avenue, occupied the area between Woodson and Richardson streets and many people, including children, lived in these houses. There was no fence between the alley proper and the right of way. The whole alleyway was, it would seem, regarded by the public as the alley.

Plaintiffs alleged "that said track (10) and houses have been so situate and occupied for a period of over fifty years; that said switch track is only one of many tracks maintained on its right of way at said point; that said track and right of way during said time, has been used by the children living along said alley and in that vicinity and the public at (as) a travelway; that said children—over said period of time—used said alley and track and right of way as a playground, and played on and about and under cars on said track; that all of said acts of said children and public were by the forbearance and tacit consent of defendant railway company; that all of said defendants knew of said user by the public and children, or could have known of it by the exercise of ordinary care."

It is further alleged that "at all times herein" defendant railroad company "permitted a number of box cars to remain standing on said switch track (10), so situate parallel to said alley; that when Jack Leonard Burnam was playing under said box cars, so situate, on the 28th day of April, 1930, that defendants, Cosgrove, Saner and Cadwell, negligently operated and caused to be operated a switch engine over said track and coupled it onto said box cars, and negligently moved said box cars without looking for children that might be under or in a place of danger about said cars, thereby causing them to run over Jack Leonard Burnam and injure him. . . . That defendants, Cadwell and Saner, negligently signaled said defendant Cosgrove to back said engine onto said switch track and against said box cars, and coupled, and caused to be coupled, said engine and box cars and caused the same to be moved over said track, without looking for children that might be under or in a place of danger about said standing box cars; . . . that the defendants, Frank M. Cosgrove, E. E. Cadwell and Logan Saner, while operating said switch engine, as agents and employees of said defendant railroad company, saw or could have seen and known—by the exercise of ordinary care—that Jack Leonard Burnam was under said box cars and in a place of danger and imminent peril, and oblivious to the same, in time, by the exercise of ordinary care, to have avoided injuring him, by not moving or causing to be moved said cars while said Jack Leonard Burnam was in a place of danger, and negligently failed to do so."

Defendants answered jointly by general denial, except as to some admissions not necessary to state, and then allege "that the switch track hereinabove and in plaintiff's petition mentioned, was used by the defendant, railroad company, and persons doing business with it, for the purpose of placing cars and unloading freight thereon and therefrom, and the alley hereinabove mentioned was the means by which persons receiving and unloading freight from said track was able to reach said track, and that by reason of such use of said track there was no fence or barricade between said track and said alley; . . . that plaintiffs and their son, the said Jack Leonard Burnam, lived in the neighborhood of said track and alley, and were acquainted with the same, and with such knowledge and with knowledge of the fact that cars were frequently placed upon and moved from said track, carelessly, negligently and habitually permitted their said minor son, Jack Leonard Burnam, to be in the alley about said track, well knowing that by reason of his tender years, he might come in contact with cars moving upon said track and be injured thereby; and carelessly and negligently failed and omitted to take any precautions to keep the said Jack Leonard Burnam from the vicinity of said alley and the railroad track, and that by reason of such carelessness and negligence of the plaintiffs said Jack Leonard Burnam

was in said alley and in the vicinity of said track while cars were moving thereon on the date mentioned in plaintiffs' petition, and the said Jack Leonard Burnam stumbled or fell and came in contact with moving cars on said track; and that such negligence of the plaintiffs contributed directly to cause the same and any injuries sustained by the said Jack Leonard Burnam." It does not appear that a reply was filed.

Defendants make 11 separate assignments, but these may be grouped and stated as (1) on the refusal of separate demurrers to the evidence at the close of the whole case; (2) on the exclusion of evidence; (3) on improper cross-examination, by plaintiffs, of their witnesses; (4) on plaintiff's Instruction No. 1; (5) on alleged improper argument; and (6) on an excessive verdict.

On the demurrers: We may speak of the separate demurrers as the demurrer. Related to the demurrer is a question of competency of evidence, which we first consider. Defendants challenged the competency of Jackie as a/ witness. If he was not a competent witness, then we do not think plaintiffs made a submissible case, hence on the competency of Jackie as a witness depends the necessity of stating the facts on the merits of the demurrer. The competency of Jackie as a witness was challenged on two grounds, viz.: First, that he was too young to appreciate the meaning and obligations of an oath; and, second, that the rule had been invoked and that Jackie had violated this rule to such an extent that he ought not to have been permitted to testify. Jackie was born September 19, 1924, and as stated, was five years, six months and nine days old at the time of his injury, April 28, 1930. At the time of the trial (April 9, 1933), he was eight years, six months and twenty days old, and was in grade 3A at school. The record as to Jackie's competency as a witness to understand, appreciate, etc., shows about as follows: "Mr. Shultz: Q. How old are you now? A. Eight years old. Q. What is your full name? A. Jack Leonard Burnam. Q. How old were you when you had your accident? A. Five years old. Q. Are you going to school now? A. Yes, sir. Q. To what school do you go? A. Humboldt. Q. What grade are you in? A. Three A. Q. Who is your teacher? A. Miss Allison. Q. Do you go to Sunday School? A. Yes, sir. Q. How frequently? A. Most every time. Q. Who is your Sunday School teacher? A. Miss Becker. Miss Cook. Q. Do you understand that you have been sworn as a witness to tell the truth and the whole truth? A. Yes. Q. What does that mean? A. Well, I don't know quite what it means. Q. What are you expected to do? A. Expected to tell the truth. Q. What happens to little boys that don't tell the truth? A. They do not go to Heaven."

Then on cross-examination by Mr. R. A. Brown, Jr.: "Q. Do you remember when your case was tried in Division Number 2 of this court? A. Yes, sir. Q. That was how long after you had been hurt?

A. Either two or one, I don't know. Q. Either two years or one year you mean? A. Yes. Q. Do you remember at that time you did not testify? A. No ma'am. Q. Do you remember there was some questions we asked you and the court asked you questions himself, in that court? A. Yes, sir. Q. Do you remember you did not remember much at that time about the accident, did you? A. Well,• I didn't quite. . . . Q. Do you remember telling Judge Vories you did not remember very well? A. Yes, sir. Q. And you did not remember very well? A. No. I can remember quite a little bit now. Q. How was it you remember now better than you did then? A. Well, I don't know. Just something in my dream last night it came to me. Yes, sir, it just happened to come to me. Q. This time yesterday you did not remember it? A. No, ma'am. Q. Last night in your dream it came to you? A. Yes, sir.

By the Court: "Q. Do you know anything about how this accident occurred outside of what you dreamed last night? A. Yes, ma'am. Q. What did the dream have to do with it, if anything? A. I don't know, but I just dreamed and just something came to me in my dream that I just remembered everything that happened. Q. Did you know what happened before you had that dream last night? A. No, I had forgotten most of it, quite a little bit of it. Q. Do you remember now anything that happened, or do you just—did you just dream something happened last night? A. I just remembered what happened. . . . Q. Jackie, what I want to be sure about is this. You haven't any right to testify what you dreamed last night. A. Yes, I know. Q. Do you remember anything about this accident outside of that dream? Do you remember what actually happened? A. Yes, I do. Q. I don't want you to testify anything you dreamed last night. That is not proper. A. Yes, I do know. Q. But if there is anything you know about this matter, if you can remember outside of that dream last night, you may go ahead and state it. A. All I know—"

The statute (See 1731, R. S. 1929, Mo. Stat. Ann., sec. 1731, p. 4011) provides that "a child under ten years of age" shall be incompetent to testify, when it appears that such child is "incapable of receiving just impressions of the facts respecting which" such child is "examined, or of relating them truly." The competency, as a witness, of a child under ten years old is within the discretion of the trial court and this discretion will not be disturbed unless abused. [State v. Jeffries, 210 Mo. 302, l. c. 327, 109 S. W. 614, 14 Ann. Cas. 524; State v. Headley, 224 Mo. 177, l. c. 188, 123 S. W. 577.] Such is the general rule and not disputed by defendants. The test of competency of a child of tender years involves four fundamental elements, all of which should be present in order for such child to be competent to testify, viz.: "(1) Present understanding of or intelligence to understand, on instruction, an obligation to speak the truth;

(2) mental capacity at the time of the occurrence in question truly to observe and to register such occurrence; (3) memory sufficient to retain an independent recollection of the observations made; and (4) capacity truly to translate into words the memory of such observation." [5 Jones' Commentaries on Evidence, sec. 2106, p. 3954.] In State v. Jackson, 318 Mo. 1149, 2 S. W. (2d) 758, a girl, eleven years old, was held to be incompetent, but there the court observed that it appeared from her evidence that she was "appallingly ignorant." Such is not the case here. Jackie, as appears from his evidence, was an intelligent lad, and there is nothing of consequence in his qualifying examination that tends to discount his competency, except what he said about the dream. Also, Jackie's evidence was about a subject that would naturally leave an impression upon his memory of a much more lasting character than if it were something that he merely saw or observed. In State v. Headley, supra, a girl five years old was held to be competent to testify, the court saying, "There is no precise age at which children are competent or incompetent. Their competency is to be determined by their apparent capacity. It belongs to the judge in each case to determine by appropriate questions the competency of the infant offered as a witness, and his decision is not open to review unless there be a clear abuse of judicial discretion, or the witness be admitted or rejected upon an erroneous view of a legal principle." As will appear hereinafter, Jackie, on the whole, gave fairly intelligent answers to the questions pertaining to the facts of his injury. Measured by the test pertaining to children of tender years, we rule that Jackie was competent to testify.

But defendants advance a theory which, if adopted, would foreclose inquiry as to Jackie's competency as a witness. This theory, in the nature of *res adjudicata*, is that when Jackie's case, for his injury, was tried some two years prior to the present trial, the trial court held that Jackie was not competent to testify. It so happened that at Jackie's trial his counsel did not desire that he testify, while counsel for defendants in that case were willing for him to testify, and waived all objections as to his competency. The point was that defendants in that case (as in the present) had witnesses to testify as to what Jackie told them about the accident resulting in his injury, and how the accident occurred. In Jackie's case there were witnesses who testified for him as to how the accident occurred, and his counsel did not offer him as a witness. In this situation counsel for defendants in that case sought to show by these witnesses what Jackie told them as to how the accident occurred, proceeding on the theory that the statements alleged to have been made by Jackie were statements against interest and, therefore, competent. Jackie's counsel (same as counsel for plaintiffs here), objected on the ground that Jackie was "a minor and under 10 years of age, to-wit, about 6 years

of age at the time of the alleged statements of admissions and the law therefore presumes on account of his age that he is incompetent to testify as a witness and for that reason he is incompetent to make admissions against himself.'' Upon this objection counsel for defendants in Jackie's case asked that the court examine him as to his qualifications, etc. It appears that this was done (but to what extent does not appear) and the court ruled: ''The court, after having seen the plaintiff on the stand, his actions, and having heard his answers to questions propounded to him, feels that he would not permit his testimony in chief as plaintiff in the case, to be heard by the jury if any objection had been made to it, and for the same reason, the court does not think any testimony as to any statement made by him heretofore would be proper.''

''The fact that a child was incompetent to testify at a former trial does not disqualify him from testifying at a second trial if his answers to the questions therein show him to be qualified.'' [70 C. J., sec. 122, p. 94; State v. Belknap (Mo.), 221 S. W. 39.] We rule that whatever happened as to the competency of Jackie to testify or to be bound by his statements in his case in no way foreclosed the right of the trial court in the present case to determine the question of Jackie's competency.

We do not deem it necessary to consider at length the complaint that Jackie was incompetent because of the violation of the rule on the witnesses. Such was a question for the sound discretion of the trial court, and there is no sufficient showing that this discretion was abused.

We now reach the demurrer on its merits. On the day of Jackie's injury there were six box cars on track 10. The north end of the north car of these six was a short distance south of the south side of the viaduct over Woodson Street. The switch stand where track 10 is connected with track 9 is about 100 feet north of Woodson. Shortly after twelve noon, the yard crew proceeded to move the six cars on 10, and to do this a switch engine to which was attached eight cars backed these cars onto track 10 at the switch north of Woodson Street. Engineer Cosgrove and fireman Gehagen were on the engine and defendants, Cadwell and Saner, and a man named Holtsclaw constituted the switching crew. Cadwell had been working in these yards since 1917, and Saner since 1920. All three of the switching crew were on the east side of the eight cars being backed in on track 10 and the engineer was on the east side of the engine cab. Defendant Saner threw the ''ten track switch'' and walked on south ''on the east side'' of track 9, between tracks 9 and 8, and defendant Cadwell was with him. At the moment when the coupling was made Saner had walked over to track 10. In walking down on the east side of 9, both Cadwell and Saner testified that they could see under the three northernmost of the standing cars on 10, and that they looked as they

walked down and did not see any one under either of these three cars. (Jackie says he was under the north car.) They walked south to a point about even with the north end of the north standing car on 10. When the coupling was made, "the chug of the car coupling" might, according to Saner, "move the standing cars . . . but not very much." The coupling was made automatically and when made, signal was given and the cars theretofore standing on 10 were moved north and off 10. The inference is that Jackie was injured when the coupling was made.

Jackie testified on the merits: "Q. Do you know Harold Mignery? A. Yes, I do. Q. Did you know him before you had the accident? A. Yes, sir. Q. Where had you seen him before you had your accident? A. I didn't see him. I played with him just a little one day and he had to go. Q. Where were you playing on that occasion? A. Behind the coal yard. Q. Where was the coal yard with reference to the alley where the track is? A. Not very far. The alley hits the cool yards. The alley and the coal yards come together. Q. On which side of the alley is the coal yard? A. On this side. Q. Opposite the railroad track? A. Yes. Q. How far did you live from this alley? A. I could not exactly tell you. Q. About how far? A. Do you mean the house and yard? Q. Yes. A. Well, the alley and the yard hit together. Q. Your yard is on the alley? A. Yes, about like that. Q. And what direction is your home from the place where the accident occurred? A. Same way the coal yard. Q. Do you know what direction that alley runs? A. It runs up. Q. The direction? With the compass, whether east or west or north or south? Do you know that? A. That way (indicating). Q. You don't know whether it is north or south? A. No, the alley runs that way (indicating). Q. Was it in the forenoon or the afternoon? A. Just a little after dinner. The COURT: What was in the forenoon? Q. At the time you had your accident, was it in the forenoon or afternoon? A. I don't know. I think it was 10 minutes after 12 or something like that. Q. Had you had your lunch? A. I was eating a piece of bread and butter when I went out. Q. Where did you see Harold? A. I went out and sat in the swing a little while and then went out and went to the corner and saw Harold going down the alley and I ran down and that is when we started playing. Q. What were you playing? A. We had some cigar boxes and bottles and we took cinders and dirt and put in the boxes and going to make a tunnel. Q. What is a tunnel? A. It is a thing to go through; a big place with a great big hole in it. Q. Where were you when you were making these tunnels? A. We did not get the tunnels made. We were getting the dirt under the car. Q. What kind of dirt? A. Dirt with cinders. Q. Who was under the car? A. Just me and Harold. Q. You and who? A. Harold. Q. Was that where you were when

you were making the tunnels or getting the dirt? A. Getting the dirt; we did not get our tunnels made. Q. Where were you playing tunnels? Or building tunnels? A. Going to build them a little ways off the track there at the track. Q. How long had you been under the car there getting the dirt and playing? A. Well, it seemed a long time, but I only think it was a couple of minutes, but it seemed a long time. Q. Can you tell us what happened there with reference to this accident? A. Well, he told me—it was like this—we were, under there getting the dirt and Harold had some dirt and he started—he was getting some more and when we heard the whistle and there was two trains—we saw one train bump into the other track right near and we thought that was the train that whistled and we did not pay any attention until it bumped this here track, then Harold jumped out and I tried to, too, but I could not. Q. What happened to you? A. It ran over my leg. At first Harold tried to get me out, but he got blood on him and got scared and ran home. Q. What did you do? A. Well, I didn't have nothing to do. After my leg was cut off I crawled myself up to the telephone pole and hung. I didn't hold by my hands, there when Mrs. Hansen came and picked me up. Q. Do you remember that? A. Yes, ma'am. Q. Did you see any of the railroad men about that track? A. No, ma'am. There was not a one."

The cross-examination was rather lengthy and among the questions were these: "What was the part that came (in the dream) to you?" and he answered: "What I didn't remember was exactly what I was getting—dirt and cinders, and that came to me in my dream, dirt and cinders, and then the other was I didn't exactly remember if I hung on the telephone post, and she came and got me from there, but that came to me in my dream if I hung and that was all. I knew the rest. . . . Q. Whatever number (of cars) there was. You say you were playing under one? A. Yes ma'am. Q. Which one? A. Second or first—let's see what it was. The first. Q. That is right? A. Yes, ma'am. Q. And whereabouts under the first car? A. You know where these cars bump in that little thing that hooks—right in there, under that. Q. Right under that? A. Yes, ma'am. Q. How long had you been there? A. It seemed to us a long time, but I think it was only a few minutes. It seemed to us a real long time. Q. You were on the ground getting this dirt and cinders? A. Yes, ma'am, when the thing bumped. I tried to jump when he jumped and he landed out and I didn't, and I could not get out. Q. Before that you were busy picking up the cinders and dirt? A. Yes, picking it up with our hands. Q. Of course, there was a car ahead of you, or part of a car? A. Whole car ahead of me. Q. And that would keep you from seeing anything ahead of you? A. Yes, ma'am. Q. And that would keep you from seeing anything to one side or the other a good deal? A. Yes, it could. Q. About the only place you

could see was due east or west? A. I could see that way and that way (indicating)."

Miss Martina Martin, a teacher, and a witness for defendants, testified that in the fall of 1930, at school in St. Joseph, Jackie told her "that he was running along on the side—he said there was a little bank by the railroad track and he was running along with the train and his foot slipped on some cinders and down he went under the train. Mrs. Hinkle, a witness for defendants, testified that about two months after the accident she took care of Jackie for a day and that on that day he told her that "he was running along the side of the tracks on the embankment and his feet slipped and he slid underneath the train." The evidence of defendants' witness, Marion Hatcher, tends to show that Jackie, when injured, was running along beside the box cars. Harold Mignery, age thirteen at the time of the trial of the present cause and the boy with whom Jackie says he was, when injured, was put on the stand by plaintiffs. Harold had previously testified twice as to the facts, the first time in the trial of Jackie's case and second, in the first trial of the present case. But when put on the stand for the third time he "backed up" on his evidence given on the former occasions and on direct examination said that he did not know where Jackie was "just before the train ran over him;" that he did not know where Jackie was then "because I was turning around and just as I turned around I heard him moan and I turned around and the train went over his foot;" that he tried to help Jackie, "pulled on him under the arms," but "seen I could not get him out and I ran home." On cross-examination Harold said that he never saw Jackie under a car; that Jackie "never was under the cars" as far as he knew, except when he was "run over by the wheels." It developed that the claim agent of defendant railroad company had, subsequent to the trial of Jackie's case, obtained two statements from Harold. The first statement was obtained January 29, 1931, and the second, December 12, 1932. These statements were introduced by defendants. The second statement did not differ so very materially from the evidence given by Harold in the trial of the cause now here. The first statement is as follows:

"I knew Jackie Burnam for a few months before he was hurt and I played with him a few times before that day. I do not remember what school I was going to at the time Jackie was hurt. I was home from school that day. I ate dinner at home the day Jackie was hurt and then I went over to Jackie's house and I and Jackie went over on Woodson St. along the tracks to play. We had only been over there a little while when Jackie got hurt. I was not under the cars when Jackie got hurt. I was playing with some bottles we were using for automobiles at the little garage we had made out of cigar boxes and dirt on the opposite side of the alley from the cars. Jackie was playing with me and when the cars started to move out he went

across the alley and ran along the side of the cars right close to the cars. When he was running along there the edge of the bank caved with him and his feet went down under the wheels. Jackie was not under the train when the cars started to move and he slipped under the cars when the bank caved in. His feet went under the wheels and his body was up on the bank. I started to help him up and saw the blood and then I ran home and told my mother.''

Defendants contend that the evidence of user of the tracks as a playground for children was not sufficient to make a submissible case under the allegations of negligence in the petition. We cannot agree with this contention, and we do not think it is necessary to detail the evidence on this question. Defendants, in effect, admit that there was ''some evidence'' on this question. In their brief defendants say: ''It seems perfectly clear that the demurrers should have been given. This case is based upon a right or privilege granted to Jack Burnam, gained by what is termed 'user.' Jack, as a matter of fact, was a trespasser in the yards of the defendant company. To justify his presence in the yards, however, it was alleged that children played generally throughout the yards, and particularly under cars on track ten; and there was some evidence to bolster up this allegation. That being so it was alleged in effect that Jackie was a licensee, and that the defendant company and its agents were under an obligation to exercise ordinary care to look out for Jackie, because they might reasonably expect him to be under one of the cars.''

Defendants further say in their brief that their contention is ''that there was no evidence, and there could be no showing that Jackie was in a place where the defendant company owed him any duty whatever, or where any of the agents of the company owed him any duty whatsoever.'' This record shows that children for years had been playing in the alleyway and that frequently they were in the railroad yards, on the standing cars therein and about the standing cars. There was no direct evidence that children had ever used the *exact place* where Jackie was injured as a place to play, but from the evidence, the inference is reasonable that the place where Jackie was playing was within the limits where children had frequently played for years. Defendants say in their brief that ''the evidence was that children played at various times in various parts of the yards. . . . All of plaintiffs' witnesses admitted (testified) that they had seen children almost all over the yards. Two witnesses stated they had seen children playing under cars, and one witness, Mr. Lofflin, stated he had seen them playing under cars on track ten. Now, track ten was a long track, some five hundred feet in length, and no one ever said that they had seen children playing under any particular car at any given spot on that track at any particular time.''

''If children have been playing in, upon, and around the standing cars in a switchyard, so continuously and for such length of

time that the employees of the railroad should have known of this user, then there is imposed upon the railroad the duty of keeping a reasonable lookout for such children." [Dalton v. M. K. & T. Ry. Co., 276 Mo. 663, 208 S. W. 828, 1. c. 831. See, also, Scott v. Davis, 216 Mo. App. 530, 270 S. W. 433, 1. c. 436; Rice v. Jefferson City Bridge & Transit Co. (Mo.), 216 S. W. 746, 1. c. 753; Privitt v. St. L.-S. F. Ry. Co. (Mo.), 300 S. W. 726, 1. c. 732; Savage v. Chicago, R. I. & P. Ry. Co., 328 Mo. 44, 40 S. W. (2d) 628, 1. c. 631; Stergon v. St. L.-S. F. Ry. Co. (Mo. App.), 286 S. W. 720, 1. c. 722.] We think that under the evidence, the liability of defendants was a question for the jury, and that the demurrer was properly refused.

■ On the exclusion of evidence: Defendants complain of the action of the trial court in refusing to admit in evidence defendants' Exhibit J. This exhibit concerns what Mrs. Hinkle would have testified at the trial of Jackie's case. In the present case defendants say that this offering "concerned directly the qualifications" of Jackie as a witness and showed that "at that time he was held to be incompetent to testify," and that "this (the exhibit) was evidence of prior statements" made by Jackie "contrary to statements made in the trial of the instant cause." We ruled above as to the competency of Jackie as a witness, and Mrs. Hinkle, as appears, supra, testified in the present cause. Exhibit J was properly refused.

■ On improper cross-examination of their witnesses by plaintiffs: Plaintiffs placed upon the stand three employees of defendant railroad company, viz.: Defendants, Cadwell and Saner, and J. H. Hulse, claim agent. We first consider the assignment as to Hulse. The claim agent was called by plaintiffs and was interrogated by counsel in the ordinary way of direct examination. Plaintiffs had called defendant Saner and he was not in the courtroom at the time, and Hulse was asked as to the whereabouts of Saner. Hulse stated that he had told Saner that he would probably not be needed for some time, and that he could go up town if he desired, and that he had told defendant Cadwell, and switchman Holtsclaw, the same; that he told them to report by telephone about four-thirty. Then Hulse was cross-examined by counsel for defendants and in this cross-examination it was disclosed, by inference at least, that Fred Kendall, a witness for plaintiffs in the first trial of the present cause, had made an affidavit that he testified falsely at that trial, and it was further disclosed that Harold Mignery, plaintiffs' witness at the first trial, had made written statements to the effect that he, too, had testified falsely. (One of these statements is set out, supra.) Hulse said that from the investigation he had made since the first trial he had reason to believe that Harold had testified falsely and that such was his reason for contacting Harold at the DeKalb school to get his statement. (The one set out supra.) In this cross-examination Hulse went into detail as to the circumstances under which both statements

were obtained from Harold, but it is not necessary to give these details here. After this cross-examination, counsel for plaintiffs proceeded, over objection and exception, on a rather vigorous cross-examination covering about twenty pages of the record. No surprise was shown or attempted to be shown, and no request to cross-examine was asked. Counsel merely proceeded to cross-examine and was, by the repeated rulings of the court, permitted to do so. This cross-examination is replete with insinuations that Hulse and other agents of defendant railroad company had "stooped to conquer," and had taken advantage of an ignorant boy and had browbeaten him, so to speak, into repudiating his evidence. There was nothing to show that Harold had been so treated. The first statement, January 29, 1931, was taken in an automobile at the school premises where Harold was a student and the second one, December 14, 1932, in the presence of Harold's father, grandfather and grandmother and the court reporter who took what Harold had to say in shorthand and when transcribed it was signed by Harold and his signature witnessed by the reporter and the grandmother.

If a party's witness is hostile, it is within the sound discretion of the court to permit cross-examination. [70 C. J. 615; State v. Church, 199 Mo. 605, 98 S. W. 16; Semper v. American Press, 217 Mo. App. 55, 273 S. W. 186.] Hulse was not a party defendant, and so far as this record reflects he did not exhibit any hostility, not even through the long, vigorous cross-examination.

The general rule is that a party may not cross-examine his own witness, Vernon v. Rife (Mo. App.), 294 S. W. 747, 1. c. 749; but there is, subject to the fairly exercised discretion of the court, a recognized exception to this rule when the witness is hostile or his interest adverse. [Vernon v. Rife, supra, and cases cited 1. c. 749. See, also, Roberts v. Kansas City Rys. Co., 204 Mo. App. 586, 228 S. W. 902, 1. c. 906; Semper v. American Press (cited supra), 217 Mo. App. 55, 273 S. W. 186, 1. c. 191; Smith v. Ohio Millers' Mut. Fire Ins. Co., 320 Mo. 146, 6 S. W. (2d) 920, 1. c. 928.] But we do not think that the cross-examination of Hulse falls within the exception. As stated above, the cross-examination of Hulse, by plaintiffs' counsel, was replete with insinuations of wrongful conduct on the part of the witness. The cross-examination was extensive in scope, suggestive, among other things, that Hulse had suggested the change in Harold Mignery's evidence; that he had got Kendall drunk, and that the defendant railroad company had been responsible for, or connived at, getting Harold in the Home for Little Wanderers. No showing, prior or subsequent to the cross-examination, was made to support any of these implications. The implication that the railroad company or any of its agents had been in any way responsible for Harold being in the Home for Little Wanderers, was completely refuted by officers of the Home.

We might state here that plaintiffs filed an affidavit of surprise as to the evidence of Harold Mignery and were permitted to cross-examine him and as to which defendants made no complaint in the motion for a new trial. In this examination it developed that "some tall man," according to Harold, had talked to him before he testified in any case, and that this man was responsible for the version Harold gave on the prior occasions when he testified, which versions were about the same as that given by Jackie. Harold was not able to name or to describe this man to any satisfactory extent.

We think that the court abused its discretion in permitting the cross-examination of Hulse, and that such was prejudicial to defendants. .

 The assignment based on the cross-examination of defendants, Cadwell and Saner, does not occupy the same status as the assignment as to Hulse, who was a mere witness, but an agent and employee of the railroad company. Cadwell and Saner, likewise, were agents and employees of the railroad company, but their interests were more than a mere employee. They were defendants against whom plaintiffs were seeking a judgment for $25,000. The statute, Section 1725, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1725, p. 4005), permits such procedure when the situation justifies. We do not think error was committed in permitting plaintiffs to cross-examine defendants Cadwell and Saner.

 Defendants assign error on plaintiffs' Instruction No. 1. It is contended that the instruction as worded (1) made an issue on children playing in the alley; (2) was misleading and confusing; (3) assumed negligence; and (4) "submitted the case to the jury on the question of whether the boy (Jackie) was under *any* of the standing cars." Since the cause is to be remanded, it is not necessary to consider at length the complaints as to Instruction No. 1. On another trial, plaintiffs should so phrase the instruction as to obviate the criticism as to the use of the alley and as to the suggested confusing and misleading character. We do not mean to imply that the instruction is so confusing or misleading as to constitute error. We do not rule that question, but since opportunity will be afforded the instruction might be recast, so as to obviate this criticism. There is no merit in the criticism that the instruction assumes negligence. It was agreed that Jackie, if under any of the cars standing on track 10, was under one of the three northernmost cars. Instruction No. 1 was so worded as to permit a finding for plaintiffs, other requirements being found, if Jackie was under *any* of the standing cars. However, defendants, in their instructions, did likewise, hence in no position to complain. If, on retrial, a similar agreement is made the instructions, no doubt, will conform.

Complaint is made on argument and excessive verdict. The specific argument complained of will not likely recur, and of course

the subject of excessive verdict, in view of another trial, is not for consideration.

The judgment, for the error above noted, should be reversed and the cause remanded. It so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.