**Polly W. BAKER, Appellant,**

v.

**Jack D. BAKER, Respondent.**

No. 22802.

Kansas City Court of Appeals.

Missouri.

Dec. 1, 1958.

Brown, Douglas & Brown, R. A. Brown, St. Joseph, for appellant.

Basil L. Kaufmann, Smith, Sherwood, Utz & Litvak, St. Joseph, for respondent.

HUNTER, Justice.

This is an appeal by Polly Baker, appellant, from a final judgment refusing modification of that portion of a previous divorce decree granting her former husband, Jack Baker, respondent, visitation privileges with his two children, Betsy Baker and Susan Baker, either all day Saturday or for two afternoons a week *and* upon her becoming four years of age the right to have Susan Baker ten days for a vacation. In the divorce decree Mrs. Baker was given the general custody of the children. As stated by appellant's counsel, "This motion (for modification) is aimed primarily at denying the right to take the child Betsy on a 10-day or two-week vacation, and for such other relief as the court thinks proper because of the evidence."

Mr. and Mrs. Baker separated in November, 1955, and were divorced on June 29, 1956. Prior to their divorce they had two children, Betsy, four years old at the

time of the hearing in December, 1957, and Susan, then two years old.

Mrs. Baker's motion for modification alleged "that there had been a change in conditions, that the defendant is not properly looking after the child, Betsy Jane Baker; that said minor child, Betsy Jane Baker, has been injured while in the custody of the defendant." On the day of trial the motion was amended to include charges that while with her father Betsy had incurred injuries in that "she has had a tooth damaged, she has complained on coming home that her 'bottom hurt' her; she has been examined on coming home, and marks, and in one instance, a laceration was found on her vagina"; that she had been subject to terrific emotional stress; that the father told her she hated her mother; that she and Susan were improperly fed; were not given proper opportunity to nap; were taken for visits when they were ill, and that Mr. Baker improperly exhibited himself to Betsy Jane. All these charges were denied by Mr. Baker in his answer.

At the trial it was disclosed that Mrs. Baker and Mr. Baker had been separated for several months prior to the divorce and that Mrs. Baker at that time had commenced a daily diary of events which she believed were injurious to her or to the welfare of the children. She continued this diary after the divorce, and relied greatly on it at the trial of the present motion. She also presented the testimony of her father and mother, Dr. and Mrs. James E. Weedin, and that of five other witnesses. Defendant presented his own testimony and that of ten other witnesses. The resultant transcript is approximately 400 pages. We have examined it carefully. It is our wish to spare the reader the burden of its details except as necessary to understand the questions presented and decided on this appeal.

The testimony on behalf of Mrs. Baker was to the following effect. Mr. Baker, in accordance with his rights under the mentioned divorce decree, some 134 times on his appointed days, took either one or both of the children. The condition of the children when they returned was such that Mrs. Baker felt they were being damaged. On numerous times after Betsy had returned from a visit with her father she was nervous, sick, nauseated and upset, and would cry out in her sleep. She was difficult for Mrs. Baker to handle. Susan, the younger, also after coming home from such visits would be sick, upset, nauseated and hysterical. Susan was allergic to certain foods, and Mr. Baker was given lists as to what she could and could not eat. Yet, usually the day after a visit with her father, she would have an allergic outbreak. On several occasions Mr. Baker did not see to it that the children took their customary naps.

Mrs. Baker testified Mr. Baker became angry on one occasion and began to swear in front of Betsy, and that in carrying Betsy he would carry her straddle across his middle with his hands under her dress.

Mrs. Baker also testified to eight occasions when Betsy had come home with a "sore bottom" after a visit with Mr. Baker. Mrs. Baker would examine the child's vagina (bottom) and upon occasion found it slightly red and put some ointment on it. On several of these occasions the child appeared to experience pain on urination. On one occasion there was a scratch on it, on another occasion a slight laceration and on still another occasion there was a bruise between the legs. Mrs. Baker called the doctor on five of these occasions. Dr. H. E. Peterson, who had cared for these children since their birth, testified that as to Betsy, he examined her on March 13, 1956, for a sore bottom, again on May 15, 1956, for some redness on it; on April 28, 1957, for "a small laceration" on it; on July 14, 1957, for "a small red spot just inside the vulva." He testified that from time to time little girls have a swelling, scratch or laceration of the vulva, and soreness or bruising; that excessive tightness of clothing; failure of the child to wipe properly

and become galled or that riding a bicycle can cause these things and that "usually you can trace it down to something of that sort." "Q. Incidentally, in the case of little children playing and getting hurt, you have seen many cases where an injury to a vagina has been a lot worse than that? A. Yes. * * * Q. This is a very minor condition? A. Right." He stated that Betsy was normally not a temperamental child and particularly not in the last few months, though at first, and for some time, he had found her "a little hard to get along with—a little jittery and nervous." That, generally speaking, Betsy was in very good health. She had experienced the usual childhood diseases such as croup, red throat, pin-worms, and on one occasion, pneumonia. According to Dr. Peterson, Susan has been fine all along.

Dr. H. Ewing Wachter, associated with Dr. Peterson, also treated the children since birth for such things as ear infection, pin-worms, respiratory infection, and has given them Salk inoculations. He treated Betsy on one occasion for her "sore bottom". He stated "it is not uncommon" to see a little girl with a scratch or laceration on her vagina; that the frequency of the occurrence with Betsy was more than that usually seen. He testified both children are healthy, normal children.

Testimony on behalf of Mr. Baker was to the following effect. Susan, the younger child, did not know him the first few times he took her and she would cry for a short time. She quickly got over that, and now is completely happy to be with him. He adores his children. He has never done anything that would have injured them. Because he has them so seldom he stays with them practically every minute of the time he has them in his custody. He does not know how Betsy got the scratch or redness on her "bottom". He often takes his children to a farm he owns, and frequently picks up a load of other children for them to play with as he feels they need the companionship of other children their age. The children would play hard and sometimes swim. They would be tired from play but never in a frenzy.

Mr. Baker does not talk to his former wife. She does not tell him about the children. She never complained to him about mistreating them, and he has never mistreated them. He turned over the allergy food lists to his mother, Mrs. Cecil Baker, because when he had the children, they had most of their meals there. The children were not fed prohibited foods, or anything that would make them sick. Mrs. Cecil Baker testified to the same effect, and told of the care she and her son took to see to it that the little girls were fed properly. Other of the ten witnesses who appeared on Mr. Baker's behalf testified to his great love and affection for his children and the tender and careful care that he gave them. They testified that the children likewise displayed love and affection for their father. They adored him, and were very happy when with him. Some testified how Mr. Baker took them to a playground in Crestview Village, where he, his children, and other adults and their children watched the children play on swings, in the sand box, etc., and that they were very contented and happy. Frequently the children played in the yard of Mr. Baker's parents. He would show them flowers. They would run down the drive to him and he would catch them. They would throw their arms around his neck and show great affection for him. He would take them for a ride in a little wagon up and down the driveway, they would swing and play on a merry-go-round in a neighbor's yard. They were always watched carefully and looked after. Some testified that the children were reluctant to leave their father's care and return to their mother at the end of a visit. They were not exhausted or worn out. They were not nervous and upset.

Mr. Baker denied he ever swore in the presence of the children, and his witnesses had never heard him use any unfit language in their presence.

At the close of all the evidence the trial court overruled and denied Mrs. Baker's motion for modification of custody.

■ On this appeal it is our duty to consider, weigh and evaluate all of the competent evidence tending to prove or to refute the essential factual issues and to reach our own findings. In so doing we are not bound by the trial court's findings but do accord them proper deference, particularly where the credibility of witnesses who appeared before the trial court is challenged. We do not hesitate to correct any errors the trial court may have made, and to enter such judgment as justice and the welfare of these children require.

■ Both sides agree that on a trial such as this the supreme and paramount consideration is the welfare of the children. As stated in Ramos v. Ramos, Mo.App., 232 S.W.2d 188, 198: "The sole question, therefore, to be determined on this point is what disposition will serve the best interest and welfare of the child. * * * The matter of determining these questions (of custody and visitation) has been vested by the law in the discretion of the trial court and an appellate court should never interfere with the exercise of such discretion unless the record shows clearly that it has been abused." See, also, Martin v. Martin, Mo.App., 160 S.W.2d 457, 459; Birrittieri v. Swanston, Mo.App., 311 S.W.2d 364, 367.

We consider first the innuendo raised by appellant that respondent has been guilty of wrongfully abusing his own child. Appellant's counsel has carefully refrained from making any direct charge to that effect but clearly desires us to do that which he directly avoids, knowing that our concern for the welfare of these children is paramount.

Although the medical testimony from Mrs. Baker's witnesses clearly indicated that it is not unusual for a little girl upon occasion to have "a red bottom", scratches and a bruise such as those described in the evidence through the normal playing of the child on bicycles, swings, and the like, Mrs. Baker has permitted these several occurrences and their frequency to create the suspicion in her mind that Mr. Baker was guilty of willful misconduct and vile abuse of his own children. If her suspicions received substantiation in the record it would be the clear duty of the trial court and of this court on appeal immediately to cause the removal of these children forever from any personal contact with their father. Where, however, as here, there is no evidence substantiating such sordid suspicions as appellant has displayed, this father is entitled to have that fact clearly pronounced by the reviewing court, and to have the question of what is best for the welfare of the children considered free of such taint. So that there be no possible doubt about it, we state unequivocally that the record before us contains no evidence whatever of any molestation or other such abuse by Mr. Baker of either of his children. On the contrary, we are convinced by the record that he is a decent and loving father who is earnestly striving to be a good father to his children and to act in accordance with their welfare.

Appellant in numerous instances sought to introduce testimony of statements made by the child, Betsy, to some adult. In many instances the trial court excluded this testimony as hearsay statements of a child, who was at most only four years old at the time of the alleged statements, and in some instances had not yet reached her fourth birthday, and who had not been qualified as a witness. Because of the substantial number of such statements, appellant's attorney in his brief has undertaken to classify them into four general groups for the purpose of discussion. We will do likewise.

As stated by appellant's counsel, "Class 1 consists of more or less general statements" allegedly made by Betsy, usually to her mother. A few typical ones are: "My daddy says don't tell my mommy what we

do." A statement by Betsy on one occasion that she did not want to go with her father. A statement by Betsy that while with her father one day she had no nap; that she was too busy to nap. That after a visit with her father Betsy said to her mother: "Don't touch me." Betsy's statement that her paternal grandmother had given her two aspirins on one occasion. Betsy's statement that while visiting with her father she had fallen while running at grandmother's house. Betsy's statement, "I am going to get Grandmother Baker's gun to shoot you." And she broke into tears and said "I love my mommy please don't leave me." Her statement that she had bumped her tooth in her daddy's car.

As his designated Class II statements, appellant's counsel has selected alleged remarks of Betsy, usually to her mother or to some other adult, and usually accompanied by some demonstration. The witness was permitted to testify to what he observed but not as to the accompanying statement of the child. Typical are: "This is the way my daddy tickles." "Granddaddy, is your bottom like my daddy's bottom?"

The Class III statements mainly concern alleged remarks by Betsy of pain or injury and usually that her "bottom" hurt. On one such occasion she said to the particular witness, after referring to her sore "bottom", "My daddy scratched me." On another she said her daddy had "looked at my bottom."

At the commencement of the trial the court announced in substance to the attorneys that because of the publicity that had been given to the charges involved in the hearing, the trial would take place in the open court room and not in chambers and that this included the qualifying of Betsy as a competent witness, if it was the appellant's intention to use her as a witness. Appellant's attorney then announced: "In view of the court's statement, I will not produce this child in open court in a hearing of this kind." No effort was made to qualify Betsey as a witness.

Section 491.060 RSMo 1949, V.A.M.S., provides: "The following persons shall be incompetent to testify: * * * (2) A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly." In State v. Jones, Mo.Sup., 230 S.W.2d 678, 680, it is stated that "In each case the trial judge is to determine by appropriate questions the competency of the child offered as a witness and his decision can only be set aside where he has abused his judicial discretion. * * *

"(1) At common law there was no presumption that an infant under the age of fourteen years had sufficient intelligence, discretion and understanding to testify as a witness, and the party offering an infant under fourteen years of age had the burden of proving capacity and, therefore, competency, before such witness was allowed to testify. Section 1895, RSMo 1939, Mo.R.S.A. § 1895, (Now Section 491.060) has lowered that age to ten years, leaving the common law rule in force as to those under ten years of age."

* * * * * *

"(3) The test of competency of a child of tender years involves four fundamental elements, all of which should be present in order for such child to be competent to testify, viz.: (1) 'Present understanding of or intelligence to understand, on instruction, an obligation to speak the truth; (2) mental capacity at the time of the occurrence in question truly to observe and to register such occurrence; (3) memory sufficient to retain an independent recollection of the observations made; and (4) capacity truly to translate into words the memory of such observation.' 5 Jones' Commentaries on Evidence, § 2106, p. 3954. Burnam v. Chicago Great Western R. Co., 340 Mo. 25, 100 S.W.2d 858, loc. cit. 862."

In State v. Groves, Mo.Sup., 295 S.W.2d 169, 172, the applicable rule is stated: "T . statute, Section 491.060 RSMo 1949, V.A.M.S., precludes any presumption that an in-

fant under the age of ten years is capable of receiving just impressions of facts or of relating them truly and it is the duty of the trial court in each case to determine whether such child is competent before permitting it to testify. The decision of the trial judge, when based on sufficient examination and observation of the child as to its competency, can only be set aside where he has abused his discretion."

The statements involved in each of these three classifications are numerous. No useful purpose would be served by discussing these statements individually, and such discussion would serve only to unduly lengthen this opinion. We have examined each statement. Most of them are clearly hearsay. Among these are statements by Betsy relating some past event or past occurrence. A relative few of the statements in question concern verbal acts or statements of present pain by Betsy.[1] Since Betsy is incompetent as a witness for any purpose, absent her proper qualification, the question is presented as to whether or not any of the multitude of statements made by her to another as detailed in this record are admissible. However, it is not necessary to a decision of this case to decide that matter. For upon assuming, but not deciding, the admissibility of these statements, on our review of them it is at once apparent that they are not persuasive on the question of whether or not respondent should have his visitation privileges with his child either terminated or otherwise changed. A consideration of all of them, along with the other evidence in the case, would not change or affect the result we reach concerning the motion to modify.

■ For Class IV, appellant's counsel recites as error the action of trial court regarding the following question asked of Dr. Peterson, "Q. * * * in your opinion as a pediatrician, should these children be kept with one person, or do you think it wise to divide their custody?" The question was objected to as invading the province of the court, and for the further reason that Dr. Peterson did not know all the facts before the court. The trial judge sustained the objection. The doctor never answered the question. Nor was any offer of proof of any type made as to what his answer would be if permitted to answer. The matter is thus incomplete, and there is nothing preserved necessitating a review and ruling on the point by this court. Keeshan v. Embassy Investment Company, Mo.App., 303 S.W.2d 666, 669; State ex inf. Mooney ex rel. Stewart v. Consolidated School Dist. No. 3, Mo.App., 281 S.W.2d 511.

■ Appellant's counsel also asserts generally that in all instances where the trial court sustained objections to questions, the trial court should have permitted him to make his offer of proof by placing the witness on the stand and presenting the offer in question and answer form. We agree that in cases tried upon facts without a jury this is ordinarily the preferable practice, and is provided for by Section 510.310 V.A.M.S. See, also, Northwestern Stove Repair Co. v. Cornwall, 148 Mo.App. 605, 128 S.W. 535; Thumm v. Lohr, Mo.App., 306 S.W.2d 604, 608. However, no prejudice has resulted as appellant's counsel in his various offers of proof has made it clear just what the witness would say, if permitted to answer the particular question, and it is apparent that the trial court, and certainly this court has accepted the offer of proof as made in good faith and as truly revealing what the testimony would be.

We next consider the testimony on behalf of appellant that on numerous times the children, and particularly Betsy, became upset, or ill after having visited their father.

1. For those who may wish to pursue the subject generally, see, State v. Ranger, 149 Me. 52, 98 A.2d 652, 655; Johnson v. Southern Ry. Co., 351 Mo. 1110, 175 S.W.2d 802, 805; Strudgeon v. Village of Sand Beach, 107 Mich. 496, 65 N.W. 616; DeWitt v. Johnson, 170 Okl. 625, 41 P.2d 476, 477; Kenney v. J. A. Folger & Co., Mo.App., 192 S.W.2d 73, 77; Gough v. General Box Co., Mo.Sup., 302 S.W.2d 884; 1 Conrad, Modern Trial Evidence, Sec. 402, page 320.

The testimony on behalf of Mr. Baker was that these children were not ill or upset when he returned them. In practically' every instance the mentioned illness or upset occurred the day following the return of the children from a visit with their father, and after they had eaten one or more meals with the mother, and had spent considerable time with their mother. There is no evidence that the father was the cause of these illnesses or upsets, or that he had neglected or mistreated the children and thus caused them. So far as the record indicates, the children could have become ill or upset from events or occurrences that took place after they left their father's care and from causes over which he had no control. At best, the cause of these upsets and illnesses, assuming that they did occur, is highly speculative. In view of all the evidence, we are not persuaded that there is any pattern reasonably indicating blame, fault, or neglect on the father's part. The record also indicates the children were occasionally ill and upset while in the mother's care and not directly subsequent to visitation with their father. A possible and reasonable explanation is that these are the somewhat customary illnesses and upsets of young children, one of whom has a food allergy, and that as the doctors indicated, generally speaking, they both are healthy, normal children.

The trial court at the time of the divorce determined that it was to the best interest and welfare of these children that they continue to have some contact with their father, and entered its decree accordingly. This is in accord with the statement in Cherry v. Cherry, Mo.App., 272 S.W.2d 700, 705, "* * * that where both parents (are) devoted to the child and of good moral character, the child should be afforded opportunity of having reasonable contacts with both parents."

We are convinced that both appellant and respondent are of good moral character and love their children. They can best promote the welfare of the children by overcoming and putting aside any purely selfish desire they may have to obtain sole custody of the children to the total exclusion of the other, and by cooperating in carrying out the decree of the trial court. Certainly they should avoid subjecting the children to any act or statement the natural effect of which would be to alienate the children's affection for the other parent. If such conduct should occur to the detriment of the children's welfare, the trial court has ample power to hear the matter and to take appropriate action.

Our conclusion, after considering all questions presented, is that the trial court reached the proper result in denying appellant's motion to modify, and we affirm its order and judgment. It is so ordered.

All concur.