v.

Cortez COLLINS, Appellant.

No. WD 62187.

Missouri Court of Appeals,
Western District.

Oct. 28, 2003.

STATE of Missouri, Respondent,

v.

Shawn Michael RAUCH, Appellant.

Nos. WD 61537, WD 61552.

Missouri Court of Appeals,
Western District.

Oct. 28, 2003.

Irene C. Karns, Columbia, MO, for appellant.

John M. Morris, III, Jefferson City, MO, for respondent.

Before JOSEPH M. ELLIS, C.J., ROBERT G. ULRICH and RONALD R. HOLLIGER, JJ.

**ORDER**

Amy Marie Bartholow, State Public Defenders Office, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson, John Munson Morris, Dora A. Fichter, Office of Attorney General, Jefferson City, for respondent.

RONALD R. HOLLIGER, Judge.

Shawn Rauch ("Shawn" or "Appellant") was charged with one count of murder in the first degree, § 565.020, RSMo, one

count of armed criminal action, § 571.015, RSMo, and one count of attempted arson in the first degree, § 569.040, RSMo.[1] Following a bench trial before the Circuit Court of Andrew County, he was found guilty on all three counts.[2] He was sentenced to a term of life imprisonment without the possibility of parole on the first-degree murder conviction, a term of thirty years imprisonment on the armed criminal action conviction, and a term of fifteen years imprisonment on the conviction for first-degree attempted arson, each sentence to run consecutively to the others. Shawn appeals his convictions, assigning a single point of error. He contends that the trial court abused its discretion in overruling his request that the defense's expert witness be allowed to view the videotaped deposition of the State's primary witness in order to form an opinion as to the witness' competency to testify. We remand with instructions.

### Facts

During trial, the State established the following facts supporting Shawn's convictions. In the fall of 1998, Tammy Forthergill ("Tammy") was romantically involved with three men: Mark Forthergill, her husband of ten years; Randy Crawford ("Crawford"), with whom she had been having an affair for four years; and a more recently-acquired lover, Appellant's father, Michael Rauch ("Michael"). On several occasions, Tammy told Michael that Crawford had been abusing her, and Michael began making plans to kill Crawford.

A week before Halloween night, 1998, Michael began talking about purchasing a crossbow. Michael, who had never hunted with a bow before, began trying to find out what kind of bow he would need to kill a deer weighing 170 pounds (which was Crawford's approximate weight). During the daylight hours of Saturday, October 31, 1998 (Halloween), Tammy, her two daughters, Michael, and a man named Byron Brushwood ("Brushwood"), who lived with Michael and had helped him run his garbage collecting business for the past several years, drove from Michael's home in Forbes, Missouri, to purchase a hunting bow at a store in Mercer, Missouri. On the way to Mercer, Michael commented that this would be a good night to commit a crime because a person could wear a mask and nobody would be able to recognize him.

In Mercer, Michael purchased a crossbow and two "broadhead" arrows with wide razor-bladed tips, using a false name. Michael said he could shoot Crawford from a safe distance and that nobody would recognize him because it was Halloween and he would wear a costume.

Michael and Brushwood loaded the crossbow and arrows, three Halloween costumes, and a one-gallon jug filled with gasoline in Michael's pickup truck. They drove to Michael's mother's house in Oregon, Missouri, where Shawn was waiting. There, and on the way to Savannah, Missouri, where Crawford lived, the threesome discussed their plan to kill Crawford. According to this plan, Brushwood was to knock on Crawford's door and when Crawford answered it; Shawn was to shoot him with an arrow from the crossbow. Michael was then supposed to pull Crawford inside the trailer, pour gasoline on his body, and set it on fire.

---

1. Unless otherwise noted, all statutory references are to RSMo 2000.

2. Rauch was also charged with one count of unlawful use of a weapon, § 571.030, RSMo, but the trial court dismissed that charge with prejudice at the conclusion of trial.

Before carrying out their plan, Shawn, Michael, and Brushwood drove by Crawford's trailer. After Shawn looked through a window and confirmed that Crawford was home, the trio drove to a parking lot behind a nearby elementary school, and Shawn and Brushwood donned Halloween costumes. Shawn's costume included a cape and a mask, while Brushwood sported a cape that covered his head and face. Although there was a wig for Michael, he did not put it on. They drove back to Crawford's trailer and parked in front of a vacant lot on 5th Street, facing Main Street. At approximately 7:30 P.M., the Savannah Police Chief, Derald Lammers ("Lammers") drove by on 5th Street in his marked patrol car and saw Michael's pickup truck parked there. As he thought the truck "looked out of place," Lammers proceeded to investigate the situation. It was dark and raining outside at this time, so Lammers could not recognize everyone in the truck. He did, however, recognize Michael, who rolled down the front driver's side window and told Lammers that he had experienced problems with the truck due to the rain, and needed to wait for several more minutes before he could start it.

After Lammers drove away, Shawn, Michael, and Brushwood began discussing whether they should go through with Crawford's murder. Shawn said, "cops are stupid" and suggested they continue as planned because the police wouldn't expect them to kill Crawford after having been seen near his trailer. The threesome subsequently decided that after dropping off Shawn and Brushwood near Crawford's trailer, Michael would drive around town while they killed Crawford. Michael hand-

ed Shawn a .25 caliber pistol, showed him how to take off the safety, and told him: "Make sure you use that [as a] last resort because it is registered." [3]

Michael dropped off Shawn and Brushwood at Crawford's trailer park, and the two made their way to Crawford's trailer. Shawn carried the crossbow and the pistol, while Brushwood carried the gasoline-filled jug. Brushwood knocked on Crawford's door and Crawford answered. Brushwood pulled the door wide open and Shawn shot Crawford in the chest with an arrow from a distance of approximately one foot. The razor-bladed point of the arrow entered and passed completely through Crawford's chest, protruding from his back between six and eight inches. After yelling, "Hey, hey, mother fucker," Crawford tried to grab Shawn and Brushwood, but staggered forward and fell to the ground outside the trailer face first. Shawn then began hitting Crawford in the head with the butt of the crossbow. Crawford got up onto his knees and started crawling up a nearby alley. Shawn then pulled out the pistol Michael had given him and shot at Crawford several times. When Crawford jumped up and began to run up the alley, Shawn and Brushwood tried to stop him. [4] During the struggle, Crawford was able to pull off Brushwood's costume and see his face. Brushwood hit Crawford on the head with the jug of gasoline, causing the jug to break. Meanwhile, Shawn continued hitting Crawford, who was then lying on the ground, with the butt of the crossbow. Finally, Shawn told Brushwood to "get the fuck out of there," and both men ran back to the place

3. Michael had purchased the gun about a month earlier, on September 29, 1998.

4. A couple accompanying their daughter trick-or-treating heard the shots and saw two men in costumes pursuing another man in the alley near Crawford's trailer, but thought it was only a Halloween prank.

where Michael had originally dropped *them off.*

Michael picked up Brushwood and Shawn shortly thereafter. Shawn told Michael that the murder did not take place as planned because Crawford saw Brushwood's face, and that Shawn shot Crawford "execution style." The three men went to Michael's house, changed shoes, and drove to the Missouri River, where they disposed of the .25 caliber pistol, the crossbow and its accessories, the unused arrow, and their costumes. They then drove to Michael's mother's house in Oregon. Shawn and Michael dropped Brushwood off about two blocks away from her home. They told Brushwood to tell Michael's mother that Brushwood had hitchhiked to Oregon, and Brushwood did as he was told.

Tammy called Michael around 8:00 A.M. the next morning (Sunday, November 1, 1998). Michael did not sound normal, and Tammy asked him what was wrong. Michael told Tammy that "things didn't go as he planned last night" and asked her to drive by Crawford's trailer to see if there were any police around. Tammy did as she was asked, and saw something that looked like a "stuffed dummy." After realizing that the "dummy" was actually Crawford's dead body, Tammy called Michael from a pay phone. Tammy told Michael there were no cops around Crawford's trailer, and Michael said that was good, since Crawford could not identify Shawn.

One of Crawford's neighbors, Orvaline Mountray, walked out to her car around 10:00 A.M. that Sunday morning and saw what appeared to be "one of those seasonal dummies" lying near Crawford's trailer. As she approached the figure, Mrs. Mountray realized that the "dummy" was actual-ly Crawford's body. Her husband Donnie *then called the police.*

The next day (Monday, November 2, 1998), the police searched Michael's residence and found a .25 caliber shell casing in the yard. Michael told them that although he had purchased a .25 caliber pistol and had fired one box of .25–caliber ammunition in his yard, he had sent the pistol back to the manufacturer since it was double feeding.

Around noon, Michael and Brushwood met with Tammy near the mall. She told them they were still under suspicion by the police. Michael told Tammy about the .25 caliber casing found by the police, and warned her "it was only a matter of time before the cops put two and two together."[5] Michael and Brushwood then discussed fleeing the state and at that time, Tammy agreed to go with them.

After work, Michael and Brushwood returned to Michael's house, where they were picked up by the police and taken to the Holt County Jail for questioning. Michael was released before Brushwood, and when Brushwood returned to Michael's house, Michael tossed him the search warrant and said, "We are fucked," explaining that the police had found a .25 caliber shell casing in his yard. The same day, the police also interrogated Shawn after he got off work. Questioned concerning his whereabouts on Halloween night, Shawn told them a story similar to the one told by Brushwood and Michael—that they all went out for supper at a restaurant in Savannah, that Michael's truck had stalled on 5th Street, and that as soon as he got the truck started they drove to Michael's mother's house in Oregon, Missouri.

**5.** The police also found two .25 caliber shell casings near the body, and three .25 caliber bullets were extracted from Crawford's body during the autopsy.

Later that night, Shawn, Michael, and Brushwood discussed a plan to flee the state. Michael subsequently called Tammy at her house and he and Brushwood made the trip over to Tammy's home. Tammy returned to Michael a 9–millimeter pistol he had given her for protection from Crawford. Michael described how he and the two others had killed Crawford, and told her they were planning to flee to Florida. Michael asked Tammy and her children to join them, but this time she refused.

Brushwood and Michael then returned to Michael's house, where Shawn was waiting. The threesome discussed their flight to Florida and prepared several loaded weapons for their escape from Missouri. They also decided that if accosted by law enforcement officials, they would have "guts and glory," meaning a shoot-out with the police.

The following day (Tuesday, November 3, 1998), they stopped at Michael's mother's house to say their good-byes and dropped by Shawn's home to retrieve a book containing telephone numbers. Shawn, Michael, and Brushwood then left for Florida in Michael's Ford Explorer, in which they had stored a variety of loaded firearms including pistols, rifles, and shotguns. The next day, Shawn was stopped by Georgia police for committing a traffic violation and was arrested for driving with a revoked license. During the traffic stop, the arresting officer learned that warrants for the arrest of Shawn and his traveling companions had been issued in Missouri

for the murder of Crawford, and they were apprehended without incident.

Shawn waived his right to a jury trial in exchange for the State's withdrawal of its intent to seek the death penalty. Brushwood and Tammy [6] negotiated plea agreements with the State in exchange for their truthful testimony, and both testified against Shawn at his trial. Shawn did not testify at trial and called no witnesses in his defense.

### Procedural History

Before addressing Shawn's point on appeal, it is necessary to recount some of the extensive pre-trial litigation on the issue of Brushwood's competency to serve as a witness during Shawn's trial.

This case was briefly assigned to two other circuit judges before being transferred to the Honorable Randall R. Jackson. In late 1999, Judge Jackson reviewed *in camera* Brushwood's school and social security records. Following this review, in December 1999, Judge Jackson issued a finding that Brushwood had a learning disability, a borderline IQ, and reduced intellectual functioning which required special education courses throughout his elementary and high school years and which interfered, to some extent, with his ability to work.[7] However, Judge Jackson also found nothing in the records to indicate that Brushwood lacked the ability to understand his obligation to testify truthfully, the capacity to observe the events about which his testimony was sought, or the capability of translating those events into words. Judge Jackson further found that

6. Tammy was facing two class D felony charges: concealing an offense and hindering prosecution.

7. Brushwood was 28 years old at the time of trial. According to the most recent test results, he has a full scale I.Q. of 53 and received a diagnosis of "mild mental retarda-

tion" with "[s]ignificantly subaverage general intellectual functioning." He was found to be mentally retarded and was receiving SSI disability benefits on that basis at the time of his arrest. He also has a speech impediment that can sometimes make him difficult to understand.

the defense was in possession of most of Brushwood's school records, ordered the disclosure of the remaining school records in the State's possession, and precluded the defense from inquiring about the school records during his deposition. The court determined that Brushwood's social security records contained more recent information and allowed inquiry about them only as related to his competency as a witness.

The State's case against Shawn was dismissed when it filed a memorandum of *nolle prosequi* approximately one month before the case was originally set to go to trial. The case was refiled by indictment on August 14, 2000, and the Honorable Daniel F. Kellogg replaced Judge Jackson. In April 2001, the State filed a motion for a protective order governing the content of any deposition of Brushwood. As before, the State asked that the defense be precluded from inquiring about Brushwood's school records and requested that inquiry about the social security records be limited to the issue of Brushwood's competency to testify as a witness. Shawn's response to the State's motion stated that he needed more time "to reassess the records issue before deciding what course to take."

In June 2001, Judge Kellogg, following his *in camera* examination of the records, issued a finding that Brushwood had a learning disability, a borderline IQ, and reduced intellectual functioning which required enrollment in special education courses throughout his elementary and secondary education and which limit-

ed his ability to work. However, like Judge Jackson before him, Judge Kellogg found nothing in the records to indicate that Brushwood lacked the ability to understand his obligation to testify truthfully, the capacity to observe and remember the events about which his testimony was sought, or the capability of translating those events into words. Judge Kellogg precluded the defense from inquiring about the school records during Brushwood's deposition but, as to his more recent social security records, allowed questions specifically relating to his competency as a witness.

A few weeks later, the defense filed a notice of its intent to take a videotaped deposition of Brushwood. The next day, the State filed a motion for a protective order, claiming that the deposition was "intended for no purpose other than to harass and demean" Brushwood. After a hearing during which the State argued that "the real thing going on here is their [the defense's] desire to videotape Byron Brushwood so it can be submitted to some shrink,"[8] Judge Kellogg issued an order that Brushwood's deposition was "not to be videotaped unless adequate measures to prevent intimidation" were employed.

After the parties reached agreement on such measures, counsel for Shawn began deposing Brushwood in October 2001. Before the deposition was completed, but after two videotapes had already been prepared,[9] the defense filed a motion seeking permission to provide the two tapes to an

---

**8.** *This prompted defense counsel to retort: "I want to thank Ms. Smith actually, and I say this with loving sarcasm and not mean sarcasm, but I honestly hadn't thought of sending that tape off to my expert, but what a great idea. I have already sent the audiotape off to him. But yeah, I'll say having been given the idea by the State, I'll do that if I have the videotape." This is typical of the* sort of bickering which, regrettably, appears to have pervaded this litigation.

**9.** Ten two-hour videotapes were ultimately required to record Brushwood's deposition, which took five days to conduct. (The last session was not recorded on videotape.) The complete deposition transcript spans some 647 written pages.

expert it had retained to evaluate Brushwood's competency as a trial witness. The State objected on the ground that this was simply a "backdoor way of obtaining an impermissible psychiatric examination of Mr. Brushwood." A few weeks later, and again before Brushwood's deposition was completed, defense counsel filed a motion requesting that Judge Kellogg declare Brushwood incompetent to testify, stating: "It has become apparent to counsel during the course of that deposition that Mr. Brushwood does not possess the mental capability required to render him competent to testify." The State objected to this request, arguing that Brushwood's deposition performance to date "clearly indicates" that he meets the legal criteria for competency as a witness in a Missouri courtroom.

In early November 2001, Judge Kellogg issued an order denying Shawn's motions, including his request to provide the videotapes to his expert, but prohibited the State from "impeaching such expert on the absence of any personal contact" with Brushwood. A week or so later, defense counsel asked Judge Kellogg to reconsider his previous ruling and to permit the videotapes of Brushwood's deposition to be shown to the defense's expert. In support of the motion, Shawn submitted an affidavit from Denis Keyes, Ph.D., an expert in the field of mental retardation. In the affidavit, Dr. Keyes stated that he had reviewed Brushwood's school and social security disability records, as well as several police reports pertaining to the case against Shawn, a brief audiotaped statement Brushwood gave to police shortly after his arrest in November 1998, and a partial transcript of Brushwood's October 2001 deposition. Dr. Keyes further averred that after reviewing those materials, he had "serious concerns about Mr. Brushwood's competence to offer accurate and meaningful testimony in the present proceeding." However, Dr. Keyes also indicated that he was "unable to make an accurate or legitimate determination of the extent of [Brushwood's] disability given only these materials," since guidelines issued by the American Psychological Association and the American Psychiatric Association require professionals to "carefully examine individuals prior to rendering any decisions or diagnoses." Dr. Keyes went on to explain that in "order to better determine his true level of competence, his responses must be put in the context of his behaviors, his mannerisms, his appearance and, probably most important, his spontaneity." Keyes therefore concluded that while "examining Mr. Brushwood directly would be the ideal, viewing videotape sessions of his deposition would greatly increase my ability to accurately determine his level of competence."

Judge Kellogg denied Shawn's motion for reconsideration, and the case proceeded to trial on November 13, 2001. Three days later, though, on his own motion, Judge Kellogg recused himself and declared a mistrial. On November 20, 2001, the Supreme Court of Missouri reassigned the case to the Honorable John R. O'Malley.

All pre-trial motions were set to be heard on April 11, 2002, and Shawn's bench trial was scheduled to begin on April 22, 2002. On March 22, 2002, defense counsel filed a request for a psychiatric or psychological evaluation of Brushwood. This motion was followed, a few days later, by a motion to declare Brushwood incompetent or in the alternative to allow the defense to provide the videotapes of the deposition to its expert.

On March 29, 2002, Shawn moved that the April 11 hearing be continued to a "time sufficient to allow the defense to prepare for trial and further litigation on

the issue of Mr. Brushwood's competency as a witness," further stating that Dr. Keyes, whose testimony the defense believed was necessary to resolve the motion for the release of the videotapes, was unavailable on April 11. In a separate motion filed the same day, Shawn also requested, for the first time, that Dr. Keyes be permitted to present live testimony in support of the defense motions. On April 2, 2002, Judge O'Malley granted Shawn's motion for continuance but denied his request to present live testimony from Dr. Keyes, observing that "[d]espite sincere attempts by the Court and all counsel," such testimony "simply cannot be arranged prior to trial." Accordingly, Judge O'Malley decided he would "rule on the motions as plead by the parties without further hearing or evidence presented." The motion hearing was held as originally scheduled on April 11, 2002, after which Judge O'Malley issued an order denying both of Shawn's March 2002 motions, noting: "The Defendant may make objections regarding Byron Brushwood's competency at the appropriate time during the trial." [10]

The bench trial before Judge O'Malley commenced on April 22, 2002. The defense quickly renewed its previously denied motions to conduct a psychological or psychiatric examination of Brushwood, to allow the videotapes of Brushwood's deposition to be shown to Dr. Keyes, and to allow Dr. Keyes to testify live in support of the motions. Judge O'Malley overruled the motions and subsequently denied the defense's request to call Dr. Keyes to present a formal testimonial offer of proof. Defense counsel then requested the opportunity to present a narrative offer of proof outlining what Dr. Keyes' testimony would

have been, which was taken under advisement. Defense counsel then sought and received permission for a brief recess to release Dr. Keyes.

The following day, just before Brushwood was called as a witness for the State, defense counsel renewed its motion to declare Brushwood incompetent as a witness. Ten deposition videotapes were introduced as defense exhibits, as well as Brushwood's school and social security records. Defense counsel then also renewed her request to make a narrative offer of proof, which was granted.

After summarizing Dr. Keyes' educational and professional qualifications, defense counsel explained that Keyes would have testified that he had reviewed Brushwood's school and social security records, a transcript of Brushwood's preliminary hearing testimony, narratives of the statements given by Brushwood found in various police reports, a transcript of an audio statement given by Brushwood to the police (as well as an audiotape of that interview), and a transcript of Brushwood's videotaped deposition.

Counsel further offered to prove that Dr. Keyes would have testified that under the ethical guidelines of the American Psychological and Psychiatric Associations, he is required to have "sufficient evidence" to render an opinion about Brushwood's competence to testify, that conducting an actual examination of Brushwood would have been the ideal way for him to have been able to render such an opinion, and that viewing the videotaped sessions of Brushwood's deposition "would have greatly increased his ability to accurately determine

---

**10.** This is acceptable procedure in a judge-tried case. *Cf. State v. Whitsett,* 232 Mo. 511, 134 S.W. 555, 560 (1910) (holding that the determination of a witness's mental competency to testify is for the judge, not the jury, and observing that in a jury trial, it is "an improper practice for the judge to leave the testimony provisionally to the jury, to be rejected by them if found ineligible to legal standards").

his level of competence." Defense counsel also stated that Dr. Keyes would have testified that he had never seen Brushwood in person, would have discussed the reasons why seeing Brushwood testify "would have been an acceptable though not ideal substitute for examining Mr. Brushwood in person," would have testified about a phenomenon with the mentally retarded called "cloaking," and would have testified "that in order for him to assess whether Mr. Brushwood was, in fact, attempting to cloak his mental retardation," he needed to see "visuals of Mr. Brushwood, namely, the tapes." Finally, counsel stated that Dr. Keyes would have testified that "he had no opinion at this point as to whether Mr. Brushwood was competent as a witness because he simply did not have what he felt he needed ... to render an opinion to the degree of scientific certainty within his field of expertise." After receiving the offer of proof, Judge O'Malley again overruled the motion to declare Brushwood incompetent as a witness and proceeded to begin receiving Brushwood's testimony.

During her extensive cross-examination of Brushwood, which covered over seventy pages of the trial transcript, defense counsel stated that she was impeaching Brushwood on more than she "might ordinarily impeach a witness," because she was still planning to ask the trial court, at the conclusion of Brushwood's testimony, to determine whether it was so inherently unreliable as to violate due process. After observing, no doubt due to the case's long prior history, that Brushwood "has apparently testified innumerable times," covering "thousands of pages" of transcript, Judge O'Malley noted that defense counsel was impeaching Brushwood with "the most ... minute details of an event three and a half years ago," but gave counsel great latitude in continuing her impeachment. At the conclusion of Brushwood's testimony,

defense counsel renewed her oft-denied motion to declare Brushwood incompetent as a witness, or in the alternative to find him so inherently unreliable as to violate Shawn's due process rights. The court stated: "After observing him and listening to him testify carefully, I overrule your motion."

## Issue on Appeal

In his sole point on appeal, Shawn argues that the trial court abused its discretion in overruling defense counsel's request to allow the defense's expert, Dr. Denis Keyes, to view the videotapes of Brushwood's deposition, in violation of Shawn's right to due process, to a fair trial, to present a defense, and to the effective assistance of counsel, in that Brushwood's trial testimony was a critical part of the State's case against him and the ruling precluded the defense from fully litigating the issue of Brushwood's competence to serve as a witness. He requests that this court remand his case to the trial court for the limited purpose of conducting a hearing on the issue of Brushwood's competence to serve as a witness, with instructions that Dr. Keyes be permitted to view the videotapes of Brushwood's deposition beforehand. If, after this hearing, the trial court finds that Brushwood is incompetent as a witness, Shawn requests that we reverse his convictions and remand for a new trial on all charges.

## Discussion

Citing *State v. Seiter*, 949 S.W.2d 218 (Mo.App.1997) and *State v. Wounded Head*, 305 N.W.2d 677 (S.D.1981), the State claims that Shawn's various requests to have his expert view Brushwood's videotaped deposition were merely "fishing expeditions," with no prior showing of the likelihood that any useful information would be obtained. The State, therefore,

argues that the trial court's denial of access to the videotapes was not an abuse of discretion.

 The request in the case at bar was not, however, the type of fishing expedition described in *Seiter* and *Wounded Head*. In *Seiter,* the Eastern District held that the trial court did not err in quashing subpoenas *duces tecum* seeking production of the complaining witness' psychological and school records without conducting an *in camera* inspection thereof since the defendant had made "no showing of the relevancy, materiality, and exculpatory nature of the information he sought" from the records and was not entitled to their production "on the mere possibility that the information contained therein might be helpful to his case." 949 S.W.2d at 221. In *Wounded Head,* the Supreme Court of South Dakota held that the trial court did not abuse its discretion in denying the defense's request for further discovery of the complaining witness' juvenile records to support its motion to declare her incompetent to testify since the defense psychiatrist's examination of the records, which merely "suggested a high probability that the prosecutrix tends to shift responsibility for her behavior to others," was "speculative and did not provide the required substantial showing of need and justification." 305 N.W.2d at 679. In the instant case, Dr. Keyes stated that after reviewing Brushwood's psychiatric, school and disability records he had serious concerns about Brushwood's competency, but that ethically he could not finalize an opinion without at least seeing the witness by means of the videotape. Furthermore, the State did not assert its "fishing expedition" objection at trial, but claimed instead that allowing the expert to see the videos would be the equivalent of ordering a psychiatric examination of the witness, which a trial court cannot do under *State v. Robinson,* 835 S.W.2d 303 (Mo. banc 1992).

 *Robinson* is the leading Missouri case on issues of testimonial competency. In Missouri, a witness is considered competent to testify if he or she demonstrates: (1) a present understanding of, or the ability to understand upon instruction, the obligation to speak the truth; (2) the capacity to observe the occurrence about which testimony is sought; (3) the capacity to remember the occurrence about which testimony is sought; and (4) the capacity to translate the occurrence into words. *Robinson,* 835 S.W.2d at 307. Missouri presumes that a witness is competent to testify, except for a few statutory exceptions including mental incapacitation. *Id.* A prior adjudication of mental incompetence or a past record of confinement in a mental hospital is not conclusive; to be declared incompetent to testify, a witness must exhibit some mental infirmity *and* fail to meet one or more of the traditional criteria for witness competence. *Id.; see also McCrary v. Ogden,* 267 S.W.2d 670, 672 (Mo.1954) (witness who is not under an adjudication of insanity or confined in a mental institution at the time of his production for examination is presumed to be competent, and the burden of proof to show otherwise is on the opposing party). If the witness is confined to a mental institution, the presumption is that the witness is incompetent, and the burden shifts to the party offering the witness to prove that the witness meets the traditional criteria for witness competence. *Robinson,* 835 S.W.2d at 307. Whether or not a witness is competent to testify is a discretionary determination for the trial court, whose ruling will not be reversed on appeal except upon a showing of clear abuse of that discretion.[11] *Id.*

11. Historically, the appellate courts of this state have been quite deferential to trial court

*Robinson* also outlines the procedures to be followed in litigating the issue of a potentially mentally infirm witness's competence to testify. To begin with, after contrasting the arguments for and against recognizing an inherent judicial authority to order the psychiatric examination of a witness, the court in *Robinson* ruled that "trial courts are without authority to order witnesses to submit to psychiatric examinations."[12] *Id.* However, the court proceeded to hold that if the defense believes that a witness for the State is incompetent to testify, it might file a motion for a competency hearing, to be held outside the presence of the jury. *Id.* During this hearing, the State may present evidence, including testimony by the challenged witness and its psychiatrist (if any), in an attempt to show that the challenged witness is competent. *Id.* The defense may also present evidence, cross-examine the State's witnesses, and call its psychiatrist (if any) to show incompetence. *Id.* "As long as both the state and the defense are given equal access to the witness's medical records and neither side's psychiatrist has a private session with the witness, both sides are in an equivalent position. Both psychiatrists have the same authority behind their evaluations of the witness's credibility and competency. If the state's psychiatrist conducts an in-person examination, and the defense does not, the trial judge may exclude the state psychiatrist from testifying about the witness's mental condition." *Id.*

■■■ The State points out that Shawn never expressly requested an evidentiary hearing on the issue of Brushwood's competency which *specifically involved his expert.*[13] Although this is technically correct,

---

rulings on the competence of mentally disabled witnesses. *See, e.g., State v. Smith,* 203 Mo. 695, 102 S.W. 526 (1907) (17–year–old deaf-mute with the intelligence of an eight to eleven year-old child who would habitually follow her mother around like a small child, sit down, dress a doll, and play with it for hours held to be a competent witness in rape prosecution); *McCrary v. Ogden,* 267 S.W.2d 670, 672 (Mo.1954) (no abuse of discretion in allowing 38–year–old "low-grade moron" with the mental ability of a seven-year-old child to testify as a witness for plaintiffs in a wrongful death action); *Dennis v. Sears, Roebuck & Co.,* 461 S.W.2d 325 (Mo.App.1970) (no abuse of discretion in permitting a 59–year–old witness, who was mentally retarded and had not progressed intellectually beyond the age of 10 or 12 years, to testify as plaintiff in a personal injury case).

12. Defense counsel in this case, nevertheless, repeatedly moved the trial court for an order compelling Brushwood to submit to a psychiatric or psychological evaluation. However, as the Supreme Court of Missouri observed in *Robinson:* "As the expansion of the discovery process that defendant requests is not required by constitution, statute, or rule, arguments for this expansion properly belong in the General Assembly, not this Court." 835 S.W.2d at 307.

13. The record does show that on October 25, 2001, defense counsel requested "an evidentiary hearing on the competency of Mr. Brushwood." In conjunction with this request, defense counsel also applied for a writ of habeas corpus *ad testificandum* commanding the sheriff of Andrew County to bring Brushwood into court for the hearing, which had been scheduled for November 2. Judge Kellogg issued the writ on October 30 for execution "no later than 1:00 p.m., November 2, 2001." While this writ was successfully served on Brushwood by the sheriff on November 2, the competency hearing evidently never took place. As best we can tell, this is because Judge Kellogg granted the State's motion, filed on November 2, to quash the writ he had issued on October 30. Although the record does not reflect the grounds upon which Judge Kellogg quashed the writ he had issued just three days earlier, the State's motion to quash stated, *inter alia,* that: "Defendant knows that witness Brushwood is in fear for his life at the hands of defendant and co-defendant Michael Rauch and the writ in question is calculated only to further intimidate witness Brushwood from testifying truth-

we do not consider this failure a waiver for several reasons. One is that the issue of a witness' competency (as opposed to his credibility) is a matter for the judge to determine outside the hearing of the jury.[14] In a court-tried case, such as this one, the necessity of separating the evidence of competency from other evidence is not so important. Additionally, the State's argument presupposes that the defense had obtained all necessary and legally obtainable information to proceed with such a hearing. The State's failure to provide the necessary information to the defense expert so that he could form an opinion and testify before the trial judge on the competency issue is the very complaint made here. And, finally, even as regards the issue of witness competency, the trial judge indicated he would be taking the issue with the case and in fact did not rule upon the motion until the completion of Brushwood's testimony.

■ The State suggests, additionally, that for these reasons defense counsel should have had the expert witness observe Brushwood's trial testimony in order to have the personal observation the defense claims was necessary for him to finalize an opinion. However, under the unusual circumstances of this case, we do not find that the release of the witness on the morning of trial constitutes a waiver of the defense's complaint.

First, we note that after declining to allow the defendant to make a testimonial offer of proof involving its expert witness, the trial court suggested that defense counsel could take a break to send the witness away. Secondly, it appears that the trial judge was of the belief that the issues surrounding the expert and his access to additional information had been repeatedly litigated before several other judges, that they had made their determinations, and that he was not going to revisit those decisions.[15] Finally, although in a court-tried case like this it would have been acceptable for Judge O'Malley to have heard testimony from Dr. Keyes *after* receiving Brushwood's testimony and then to have possibly struck Brushwood's testimony on the basis of his incompetency, under the circumstances we cannot fault defense counsel for failing to demand such an unusual remedy, which was neither customary nor obvious enough to support a finding of waiver and was clearly unanticipated at the time by counsel for both parties, not to mention Judge O'Malley.

■ Thus, we are left with the question that the State largely ignores on appeal: Did the trial court abuse its discretion in refusing, on several occasions, to allow defendant's expert witness to view the videotapes of Brushwood's deposition? We believe that it did. A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Redfield v. Beverly Health & Re-*

fully, by compelling his appearance in front of the defendant in a non-trial setting." As noted earlier in this opinion, the case proceeded to trial before Judge Kellogg on November 13, 2001, before he later declared a mistrial.

**14.** *See McCrary,* 267 S.W.2d at 673–74; *State v. Armbruster,* 541 S.W.2d 357, 361 n. 2 (Mo. App.1976). As Shawn makes no claim in his brief that Brushwood's testimony is so inherently contradictory that it must be rejected in

its entirety, he is now precluded from lodging any such complaint.

**15.** Judge O'Malley remarked that "there have been a lot of trees killed considering this." In rejecting Shawn's formal testimonial offer of proof, Judge O'Malley also said that he did not "think there is anything to be served by even the offer of proof, given that this case is in this posture at this point."

*hab. Servs. Inc.*, 42 S.W.3d 703, 711 (Mo. App.2001). In the case at bar, the trial court's discretion was to be exercised in careful consideration of Shawn's rights as a criminal defendant. The right to present a defense is a fundamental element of due process. *State v. Crow*, 63 S.W.3d 270, 275 (Mo.App.2001). As is the case here, once an indigent defendant has received from the State the psychiatric records of a material witness like Brushwood, a second right becomes relevant: access to needed expert technical assistance. *Robinson*, 835 S.W.2d at 307 (*citing Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)). After examining the challenged witness' medical records, this defense expert "can assist the defense in challenging the complainant's competence and also give advice to the defense on psychiatric aspects of the case." *Id.* Full adjudication of a substantial challenge to a witness' competency can, therefore, be greatly aided by expert testimony. *Robinson*, 835 S.W.2d at 306 (*citing Easterday v. State*, 254 Ind. 13, 256 N.E.2d 901, 905–06 (1970)).

As mentioned earlier, the only rationale the State gave before and during trial for denying the defense's expert access to the videotapes has been abandoned on appeal—and, we think, with obvious reason. The State's claim at and before trial—that allowing the tapes to be viewed by Dr. Keyes was the equivalent of ordering an impermissible private, face-to-face psychiatric examination—lacks any logical, legal or scientific basis in the record.[16] We can perceive no other basis, nor does the State assert any other rationale, to support denying the defense's expert access

to existing information, particularly when the record made by the defense clearly established its expert's reasonable need for the material. In other words, we think the logic of the circumstances and careful consideration of the issue before the trial court compelled a different ruling on Shawn's repeated motions requesting that Dr. Keyes be permitted to view the videotapes of Brushwood's deposition so he could properly form and express his expert opinion as to Brushwood's competency to testify. Citing *State v. Tisius*, 92 S.W.3d 751, 762 (Mo. banc 2002), the State nevertheless argues that the court cannot be held to have abused its discretion for the denial of discovery unless the defendant shows that the error was outcome-determinative. That position ignores a fundamental difference in this case from *Tisius*. Here, Shawn had the discovery—Brushwood's video deposition—but was denied its full use with his expert. Even so, the evidence, other than Brushwood's testimony, was not overwhelming and consisted largely of otherwise hearsay statements made by Shawn's alleged conspirators and accomplices.

We hold that the trial court erred in ruling that Brushwood was competent to serve as a witness without affording defendant's expert an opportunity to view the videotapes and present testimony regarding Brushwood's competency as a witness.

The cause is remanded to the trial court with directions that it conduct a hearing on the limited issue of Brushwood's competency to testify after the defense's expert witness has been allowed to view the videotapes of Brushwood's deposition.[17] We

---

**16.** Indeed, under this rationale, which the State argued to several of the five different trial judges who at one time presided over this case, Dr. Keyes should also have been prohibited from observing Brushwood's testimony either at a pre-trial hearing or at trial.

Such was the illogic of the State's proffered justification.

**17.** If desired, of course, the State will be entitled to have the tapes reviewed by its own expert. If either party is concerned about

see no need for Brushwood himself to testify again unless the trial court in its discretion feels such additional testimony is necessary for its ultimate resolution of the issue. If the trial court determines that Brushwood was not competent, it shall grant a new trial.

PAUL M. SPINDEN, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.

---

potential re-release or unauthorized use of the videotapes, the trial court may fashion a protective order under Rule 56.01(c) restricting counsel's dissemination of the tapes to anyone other than the parties' duly designated experts. *See, e.g., Edwards v. Mo. State Bd. of Chiropractic Exam'rs,* 85 S.W.3d 10, 22 (Mo. App.2002).