THE STATE v. MARION JACKSON, Appellant.—2 S. W. (2d) 758.

Division Two, February 18, 1928.

1150

*Thomas H. Henson* and *M. W. Henson* for appellant.

*North T. Gentry,* Attorney-General, and *A. M. Meyer,* Special Assistant Attorney-General, for respondent.

WHITE, J.—The defendant appeals from a judgment following a verdict of the jury in the Circuit Court of Butler County, August 2, 1927, finding him guilty of murder in the first degree, and assessing his punishment "at balance of natural life in penitentiary."

The information charges that Earl Jackson murdered Mary Jackson, wife of the defendant, and that he was incited and moved to that deed by his father, the defendant. Earl Jackson was a boy fifteen years of age at the time. Mary Jackson was the second wife of Marion Jackson. Besides Earl Jackson, Marion Jackson had by a former marriage one daughter, Hazel Jackson, eleven years old, and another son whose age is not given. There was one daughter, three years old, by the second wife, the deceased.

That Earl Jackson committed the murder is undisputed. The principal point urged in the case is that the evidence was insufficient to submit to the jury the question of the defendant's guilt in procuring his son to commit the murder.

Earl Jackson was the principal witness for the State. His testimony shows him to be callous, brutal and utterly indifferent as to the enormity of the deed which he committed. He spoke of his stepmother as "that woman" in brusquely telling his story. On the seventh day of October, 1926, in the forenoon, by some means he induced her to go to the field with him. He said they went hunting. When he saw her last in the field she was dead; she got killed; he killed her with an axe. He then went to the house, got a shovel, dug a shallow grave and buried her. He said he killed her "because she said she aimed to kill me if I didn't kill her." He denied that he had any conversation with his father, the defendant, in relation to the matter before the deed or afterwards. Several days later the body was found by another boy while hunting.

Marion Jackson, defendant, went to town that forenoon and did not return until later in the day. Earl testified that he went hunting with his father in the afternoon and they were gone about two hours.

The prosecutor then asked him to tell the jury what he had told him, the prosecutor, about it. The witness said:

"I didn't tell you the truth about it."

Then these questions:

"Q. When did you tell the truth? A. I have never told the truth about this case.

"Q. Are you telling the truth now? A. Yes.

"Q. What did you kill Mary Jackson for? A. Nothing.

"Q. What did you kill Mary Jackson for? A. She said she aimed to kill me if I didn't kill her."

He stuck to this preposterous statement, that she invited her own death by telling him that she was going to kill him if he didn't kill her first. He offered no explanation as to how that conversation arose.

The State then introduced Frank Cooper who said that one day about a week before Mary Jackson was missing the defendant rode with him in his wagon, and told him that he was going to "get shut of Mary one way or another," and said: "Frank, I will give you a ten-dollar bill if you will beg my wife away from me and never let her come back." This witness admitted that he had been convicted of perjury, but claimed that he was innocent of that crime.

Three weeks or a month before Mary Jackson disappeared Lawrence Wilkerson had a conversation with the defendant in which defendant said he wanted to get rid of his wife; she was hard to get along with and he would like to get rid of her in some way.

Herman Pettipool testified that he had a conversation with defendant before Mary Jackson disappeared, in which defendant said he would like to "get shut of her and asked me what would I do to get shut of her."

Charles Rose, police officer, testified he was watching the jail in which Earl Jackson and Marion Jackson were confined while a former trial of the case was in progress, and heard a conversation between Earl Jackson and Marion who talked from their cells opposite each other on the hall. In that conversation Marion said to Earl:

"Hazel didn't tell all of it the way we told her to tell it, but she told part of what we told her; she did fairly well for a girl of her age."

He then said:

"I am very much surprised at the State;" And,

"We had better hush, Son, until we hear what happened in this case; there might be somebody listening and we don't want to say too much until we hear what happens."

Hazel Jackson, eleven-year-old girl, testified for the State. She said her stepmother went with her brother Earl up in the field the day she disappeared, and Earl came back to the house after about thirty minutes. That was about eleven o'clock. Her father went to town that forenoon. When asked what her father said to her, she answered: "He told me to tell that she (Mary) went towards Mr. Pettipool's, or they would come and get him and he would never get to see me and little Irene any more." She repeated that statement several times.

From her testimony this girl appears to have been appallingly ignorant. She was asked if she knew what Mr. Kearby, the prosecuting attorney, was trying to do. She answered: "He is trying to clear Papa." She said that nobody had told her that, and when asked where she got the idea she made no answer. She didn't know whether her father's attorney was unfriendly to her, but she thought Mr. Kearby was friendly to her. In answer to a question she said she did not know what an oath was. She was asked if she knew she had taken an oath a minute ago, and her answer was "no."

The defendant testified on his own behalf that he never made the statements attributed to him by Cooper, Wilkerson, Pettipool, or his daughter, and said that he had no conversation with Earl Jackson at any time in relation to killing Mary Jackson.

He introduced several witnesses to show that he had a good reputation. Other witnesses swore that when his wife disappeared he showed anxiety about it, and went to the post-office and wrote a letter addressed to Mary Jackson at some place in Kentucky. The letter was returned unclaimed.

The statements made to Cooper, Wilkinson and Pettipool showed a desire of the defendant to get rid of his wife in some way. There is nothing in them to indicate that he intended to get rid of her by a process of murder. They are all as consistent with innocence of that design as with guilt. [State v. Buckley, 274 S. W. 74.]

The conversation which the deputy sheriff overheard between the two Jacksons in jail while the jury was out on his case does not necessarily indicate guilt. He was being tried for his life, and induced his daughter to swear falsely in his favor. As reprehensible as it is he might do that if he were innocent of the crime charged.

The most damaging evidence against the defendant, if competent, was his instruction to Hazel to tell that Mary Jackson had gone to Mr. Pettipool's; if she didn't, they would get him and he would never get to see her and little Irene any more.

If he had said that to her on the day that Mary Jackson disappeared, it would be a circumstance against the defendant. The record does not show when that conversation took place; whether he gave her that instruction before the body was discovered, or with a view to her testimony at the trial. But it is susceptible of the explanation that he knew or suspected that his son had committed the deed without himself being a party to it, and very naturally he would at once infer that he would be suspected.

The principal trouble with her testimony was that in effect she was not a sworn witness. Not only did she not know that she was sworn; she did not know what it meant to be sworn. A judgment cannot be based upon testimony produced by a witness who is not put under the pains and penalties of perjury. The party affected by the testimony has a right to that assurance, that his rights are not jeopardized by reckless statements. [40 Cyc. 2410.] A child of that age probably could not be convicted of perjury, but in order to be a competent witness she should know that the consequence of false swearing is punishment.

It is true that under Section 5418, Revised Statutes 1919, a witness over ten years of age is prima-facie competent. But any witness may be shown to be incompetent, and that is what occurred in this case. [State v. Anderson, 252 Mo. l. c. 97; State v. Herring and Baldwin, 268 Mo. l. c. 531.]

The defendant did not object to the testimony of Hazel Jackson on the ground that she was not a competent witness; therefore her statement went in for what it is worth. But in determining whether a submissible case was made out we must take into consideration the utter incompetence of the witness and unreliability of anything she might say. [State v. Welton, 225 S. W. l. c. 968.]

It is a reasonable inference that Earl Jackson had told a story to the prosecuting attorney which implicated his father in the deed which he committed; that the prosecutor put him upon the stand for the purpose of proving Marion Jackson's agency in the murder and the witness failed him. Thus, there probably was evidence which would justify a conviction of Marion Jackson, but the State could not produce it. The defendant cannot be convicted on evidence that was not introduced. There was no evidence to show that he had a conversation with his son in regard to the wife, prior to the killing.

Not one of these circumstances mentioned is inconsistent with innocence. Either one of them or all of them together might have occurred and the defendant still be innocent. The most that can be said of them is that they raise a very strong suspicion that the defendant was guilty.

Upon the whole the case was not made out for the jury, although it is possible that on another trial sufficient evidence may be produced to authorize a submission.

Accordingly the judgment is reversed and the cause remanded. All concur.