**McCRARY et ux. v. OGDEN et al.**

No. 43906.

Supreme Court of Missouri.

Division No. 1.

April 12, 1954.

Rehearing Denied May 10, 1954.

672

Herbert Van Fleet, Joplin, Seiler, Blanchard & Van Fleet, Joplin, James M. Tatum, Pineville, of counsel, for appellants.

James L. Paul, Pineville, Ruark & Ruark, Neosho, Burden & Shortridge, Joplin, for respondents.

COIL, Commissioner.

Appellants (defendants below) have appealed from plaintiffs-respondents' judgment for $10,000 for the wrongful death of their 17-year-old son, who was killed when defendants' truck collided with deceased's automobile. Defendants contend: that the trial court erred in permitting an incompetent witness to testify and in admitting other evidence; that without the allegedly incompetent testimony, plaintiffs failed to make a submissible case; and that the judgment is excessive and so excessive as to indicate bias and prejudice on the part of the jury.

The accident occurred on March 6, 1951, about 11 o'clock on a dark, clear night, on 2-lane, 22-foot, dry, concrete U. S. Highway 71, between Neosho and Joplin. Defendants' truck, loaded with about 15 walnut logs, was proceeding uphill northwardly around a left curve when, according to plaintiffs' evidence, a left-protruding log struck the windshield of deceased's southbound Chevrolet coupe and pulled it into the truck's left rear side.

Freddie Shirley, deceased's sole passenger, was proffered as plaintiffs' witness. Defendants' objection that he was incompetent to testify was overruled. It was shown (in the absence of the jury) that Shirley, 38 years old at trial time, had been adjudicated insane and committed to State Hospital No. 3 by the Probate Court of Newton County; that he was admitted to the hospital on August 25, 1950, paroled October 1, 1950, and finally discharged November 5, 1951; that on March 4, 1953, a little more than a month before the trial, it was adjudicated that he had "fully recovered his mental health and has been restored to his right mind and is now capable of managing his own affairs."

Section 491.060 RSMo 1949, V.A.M.S., provides in pertinent part: "The following persons shall be incompetent to testify: (1) a person of unsound mind at the time of his production for examination * * *." It is apparent that at the time Shirley was produced for examination, he was not under an adjudication of insanity or confined in a mental institution. Under those circumstances, he was presumed to be a competent witness and the burden was on defendants to show his incompetency by proof that he was then of unsound mind. State v. Herring, 268 Mo. 514, 535, 188 S.W. 169, 174. Thus, the question before the court at the hearing on Shirley's competency was whether he was of unsound mind at trial time (and perhaps the further question of whether the witness was sensible to or understood the obligation of an oath. See: State v. Jackson, 318 Mo. 1149, 1154, 2 S.W.2d 758, 760[3, 4]; 58 Am.Jur., Witnesses, § 125, p. 95). We think the trial court correctly ruled that defendants failed to show that Shirley was of unsound mind, that he was sensible to the obligation of an oath, and that he was a competent witness; and certainly the trial court did not abuse its discretion in so ruling. State v. McCrackin, Mo.Sup., 162 S.W.2d 853[1].

At the competency hearing, the superintendent of State Hospital No. 3 testified that Shirley was diagnosed on admission as a person mentally deficient but not insane—a low-grade moron with the mentality of a child about seven years of age; that he could not read or write and had childish reactions. The witness' further testimony supported his diagnosis and his observations that Shirley's low mentality prevent-

ed him from: naming his relatives, giving his birth date, or following any but the simplest orders; caused him to name Roosevelt as the current President, to answer that 3 plus 5 is 6, and in counting, to arrive at 36 and then jump to 50. The witness also said that he wouldn't expect a great deal of change in Shirley's mentality between the time of examination and trial time; that he knew nothing about Shirley's mental condition either on March 6, 1951 (the collision date), or at trial time; that Shirley had a speech defect which made it difficult for others to understand him; that witness didn't have an opinion as to whether Shirley would be able to remember the event in which a friend was killed, but that 7-year-old children do have vivid memories.

Another doctor, adduced by defendants, testified that, in his opinion, Shirley did not have the ability to remember or accurately relate events; that, while Shirley was not insane, he had a low mentality and was not "competent"; and that Shirley's mental condition at the time of the doctor's examination would continue.

Plaintiffs' medical witness said that while Shirley was of a low type mentally, he was nevertheless "competent" in that he could relate facts that he had observed; that his main difficulty, because of a speech defect, was to make the person to whom he was talking understand; and that, in the doctor's opinion, Shirley was of a mental age of 14 or 15 years.

Shirley testified that he understood what it meant to be sworn on his oath and to tell the truth; understood the penalties of perjury; and that he remembered the collision. On cross-examination, it was demonstrated that he did not know the day of the week on which he was then testifying (he thought it was Monday rather than the correct day, Thursday); he didn't know the date; he thought he had been in the state hospital until about two months prior to the trial, when, in fact, it had been over two years; he said 3 plus 2 was 6; and that he thought Roosevelt was then (1953) President. Plaintiffs offered Shirley's deposition taken about four months prior to trial. We have examined the deposition and, while there are inconsistencies in Shirley's testimony, there is nothing therein to compel the conclusion that he was of unsound mind.

■ The foregoing summary of the evidence at the hearing on Shirley's competency demonstrates, we think, that defendants failed to show that he was of unsound mind at the time he was produced for examination. Defendants insist, apparently because their medical witness testified that Shirley had the mental ability of a 7-year-old child, that the second subdivision[1] of Section 491.060, supra, applies. Defendants have cited cases[2] dealing with the competency of children under 10 years of age wherein that subdivision was considered. But subdivision two has no application to a witness 38 years of age. That is not to say, however, that all available evidence, including Shirley's *mental age*, was not properly considered in determining whether the witness was in fact of unsound mind at the time he was produced for examination. It is to say, however, that the question before the trial court, as to the 38-year-old witness, was whether he was of unsound mind at the time he was produced to testify.

■ Defendants also insist that Shirley's testimony at the trial, his deposition testimony, and a comparison of them, are matters which should be considered in determining his competency as a witness. We think defendants have confused the question of the witness' credibility with the question of his competency. The matters pointed to in defendants' brief (which de-

---

**1.** "The following persons shall be incompetent to testify: * * * (2) A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which they are ex-amined, or of relating them truly; * * *."

**2.** State v. Jones, 360 Mo. 723, 230 S.W. 2d 678; State v. Tillett, Mo.Sup., 233 S. W.2d 690; State v. Smith, Mo.Sup., 261 S.W.2d 50.

fendants contend show the ignorance of the witness, his inability to relate events accurately, the inconsistencies in his direct and cross-examinations and in his deposition testimony compared with his trial testimony) are all matters affecting Shirley's credibility. Those matters went to the weight to be given his testimony by the jury. They did not affect his competency except as they may have tended to prove that he was a person of unsound mind when plaintiffs offered him as a witness. Likewise, as to defendants' contention that Shirley's incompetency was demonstrated because, defendants say, some of his testimony was contrary to physical facts and laws. (It should be noted that defendants do not contend that Shirley's testimony should be disregarded because it was so inconsistent and contrary to common experience and physical laws as to destroy its probative effect.) We note that defendants did not impeach the credibility of the witness on cross-examination at the trial by developing the same matters which were brought out on cross-examination at the hearing before the court. Certainly defendants could have done so. Those matters affected Shirley's credibility and were pertinent for the consideration of the jury in determining what weight, if any, should be given to his testimony. See: State v. Pierson, 337 Mo. 475, 486–489, 85 S.W.2d 48, 54–55.

We hold that the trial court did not err in permitting Shirley to testify as a witness.

Such ruling disposes of defendants' contention that plaintiffs failed to make a submissible case, based upon the assumption that Shirley was an incompetent witness.

Two of defendants' log trucks left the loading point at approximately the same time. The collision truck followed the other. The testimony was such that the jury reasonably could find that the collision truck made no stop between the loading and collision points. Plaintiffs' witness Whinnery, over defendants' objection and subsequent motion to strike, testified that he followed the two trucks for a distance of about 5 miles and during the entire distance ob-

served a log, 12″ to 18″ in diameter, protruding about 2 feet beyond the left front side of the truck bed. Whinnery ceased following the trucks about 13 miles from the collision point. Shirley testified that immediately before the collision, he observed a log protruding from the left front side of the truck bed of the same truck described by Whinnery.

Defendants contend that the court erred in admitting Whinnery's testimony on the ground, as we understand, that the testimony as to the protruding log 13 miles from the collision point was too remote to tend to prove that the log protruded at the collision point, and was therefore proof of a prior negligent act not connected with any alleged negligence at collision time. Defendants cite Douglas v. Twenter, Mo.Sup., 259 S.W.2d 353, 358[6]; Harter v. King, Mo.App., 259 S.W.2d 94, 95; and Wood v. Claussen, Mo.App., 207 S.W.2d 802, 809. Those are speed cases; that is to say, the question in each was whether testimony as to the speed of a vehicle a certain distance away from the collision point was admissible. Those cases do not decide the instant question. The speed of a vehicle may be instantly changed by the act of the operator while in the driver's seat. On the contrary, a log protruding from the side of a truck (in view of the testimony as to the manner in which the logs were loaded from which a jury reasonably could find that, once a log became dislodged from its position in the pyramid, it would probably not return to an unprotruding position) is a condition not subject to change by the act of the vehicle operator, unless he stopped and rearranged the load to correct the condition. As noted, the jury could find that the collision truck did not stop prior to the accident. And there was direct testimony that the same condition as to the protruding log continued to exist at collision time.

We hold that Whinnery's testimony was relevant and material as tending to prove the allegation that defendants negligently permitted a log to protrude to the left of its truck bed. In Richardson v. Impey, Tex.Civ.App., 94 S.W.2d 490, at

page 491[3], the court said: "The witness Lee also testified that he passed the boiler feed unit about two miles and a half from the place of the accident; that the trailer was defective and was not 'tracking' the truck, but 'tracked' two or three or four feet too far to the left. This testimony was not subject to appellant's objection that the place where the witness saw the truck and trailer was so far from the place of the accident that it was without probative force as to the condition of the trailer at the time of the accident. The testimony was without dispute that from the place where Mr. Lee passed the truck and trailer to the place of the accident the driver did not stop his truck, did not readjust his load, and made no effort whatever to cure the defect that caused the defective tracking; on this testimony it was a reasonable deduction for the jury that the trailer continued to 'track' too far to the left." See also: Swift & Co. v. Thompson's Adm'r, 308 Ky. 529, 214 S.W.2d 758; Boyce v. Shtukas, 306 Mich. 467, 11 N.W.2d 206, 208[1]; Kennedy Transfer Co. v. Greenfield's Adm'x, 248 Ky. 708, 59 S.W.2d 978, 980[6].

Defendants next contend that the trial court erred in permitting "the plaintiff R. E. McCrary, over objection, to testify about the position of a truck which he admitted he could not identify as defendants' truck, a log in the west ditch of the highway and the condition of a log and its relative position to the unidentified truck, debris on the highway, and a black mark."

It was conceded that the accident happened about 11 p. m. Plaintiff, father of deceased, testified that when he arrived at the scene about 1:30 a. m. (approximately 2½ hours after the collision), his son's car had been removed. He saw a truck, loaded with logs, on the east shoulder of the highway headed north; he saw a walnut log 10" to 12" in diameter at its large end and 8' to 10' in length, lying in a ditch to the west of the pavement and the bark on that log had been peeled back from its end for a distance of about 2 feet and about one third of the way around; he saw a black mark, which appeared to be a tire skid mark 4 or 5 feet long, on the west side of the pavement; he saw some glass and dirt near that mark; and he saw no marks or dirt or glass on the east side of the pavement.

 The objection to the testimony concerning the truck came too late. After witness had testified that he saw a truck and that he didn't know whether it was the one involved in the collision, two other questions and answers intervened before the defendants objected to the testimony about the truck. But, irrespective of this, we think the testimony that a truck was there was inconsequential in view of the fact that the testimony did not bear upon any disputed fact and in view of the further fact that the jury understood that the witness didn't know whether or not the truck then present had been involved in the collision. And there was other testimony that the leading truck, shortly after passing the collision point, returned to the scene and that the other truck was thereafter removed. It must have been apparent to the jury that the truck Mr. McCrary saw was the leading truck and not the one involved in the accident. In any event, we think the testimony could not, under this record, have been prejudicial to defendants, or have materially affected the merits of the action. Section 512.160(2) RSMo 1949, V.A.M.S.

 We are of the opinion that the trial court did not err in admitting McCrary's testimony as to the log, the marks, and the debris. This, because the length of time intervening between the collision and the observations made by McCrary was not so great as to imperatively call for the exclusion of such testimony. Rather, the length of time intervening and any conditions shown which would have tended to change the physical conditions at the scene, affected the weight rather than the materiality of the testimony. Clark v. Reising, 341 Mo. 282, 286, 107 S.W.2d 33, 35[3, 4].

Defendants finally contend that the judgment is excessive and so excessive as to indicate bias and prejudice on the part of the jury. Our subsequent holding that the verdict is not excessive necessarily disposes of the contention that it is "so excessive as to indicate bias and prejudice."

. Deceased would have been 18 years of age within two months after his death. The testimony was that he was a strong, healthy, good-natured, bright, alert young man and was a good worker. He had finished one year in high school but, apparently, the fall before the accident, had quit school and was working in his father's sawmill. The sawmill was operated about six months a year and it had been operating in 1951 only about a month prior to the accident. Deceased had been cutting logs before the sawmill opened and, in fact, had helped around the sawmill ever since he was big enough to do so. His father paid him about $10 a week and made no charge for room and board. To hire one to replace deceased would have cost the father at least $1 an hour. The sawmill had been closed since the son's death. At times the boy had worked at a fire tower at 50¢ an hour and had worked in a garage. He was permitted to keep the money he made. He had accumulated sufficient funds to buy the 1937 automobile which he was driving at the time of his death. He worked in the garden, helped milk the cows, gathered wood, helped take care of the chickens, and did other usual work around a rural home. He sometimes contributed to the support of the family by buying groceries with his own money. His mother testified that the family depended upon him and that he was a "mainstay" when it came to getting things done. At various times he offered her money which he had earned which she sometimes accepted and sometimes refused.

In the recent banc case of Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372, a judgment for $15,000, the maximum amount permitted by Section 537.090 RSMo 1949, V.A.M.S., was affirmed. It was there said: "Aside from regard to mitigating or aggravating circumstances, the basis of recovery for the wrongful death of a child is the value of the child's services to the parents during the child's minority." 252 S.W.2d 376[7]. (Whether our past interpretations of the section, to the effect that recovery is limited to pecuniary loss and in the case of an infant, to the value of services during minority only, are basically correct, may be debatable—but we have consistently so construed the section.) In the instant case, neither plaintiffs' damage instruction nor defendants' limiting instruction on damages referred to aggravating or mitigating circumstances or to the jury's right to consider them. In the Brewer case, it was said that facts and circumstances in a particular case may indicate that a verdict is excessive or inadequate but, in most cases, the amount of a verdict in a wrongful death case, wherein deceased is a minor, involves some element of speculation on the part of the jury. True, the speculation or, perhaps, the resolving of intangibles, must usually be greater in the proportion that the minor's age is less than 21.

And it is true that if, as defendants insist, we must hold that the jury could not find that the pecuniary loss to the parents exceeded $30 a week ($1 an hour for a 40-hour week, less the $10 a week which the father paid him) plus the value of his other services around the home; and that the value of such other services did not exceed the value of the necessities furnished him by his father, and that, inasmuch as the sawmill operated only six months per year, the pecuniary loss of $1 per hour would be only $780 a year, then defendants' conclusion that the verdict is excessive would be a sound one. However, we think the premises supporting defendants' argument are not compelled by this record. We should not arbitrarily say that a jury could not reasonably find that the pecuniary value of deceased's services to his parents would not have greatly increased during the remaining three years of his minority. He had just left school; he had just begun to earn. What situation would have developed which may have increased the value of his services to his parents, is problematical.

A jury's award for $15,000 was permitted to stand for the wrongful death of an 11-year-old child, Brewer v. Rowe, supra, on the ground that it was for the jury to determine the probabilities as to the loss to the parents during the infant's future productive years. For the same reason, we are unwilling to hold that a jury's award of

$10,000 for the wrongful death of a 17-year-old boy is excessive. The same basic considerations obtain in the two cases. The jury decided that $10,000 constituted a just award under instructions wherein it was told that the verdict should be in an amount which would represent fair and reasonable compensation for only the pecuniary loss sustained by the parents. We shall not in this case interfere with the jury's decision.

The judgment is affirmed.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.