

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

STATE OF MISSOURI,         )
         )
      Respondent,      )
         )
    v.        )      WD86794
         )
RENEE M. COLLINS,         )      Opinion filed:  June 24, 2025
         )
      Appellant.      )

**APPEAL FROM THE CIRCUIT COURT OF
BOONE COUNTY, MISSOURI
THE HONORABLE JEFF HARRIS, JUDGE**

Before Division Two:  Cynthia L. Martin, Presiding Judge,
Gary D. Witt, Judge and W. Douglas Thomson, Judge

Renee M. Collins ("Collins") appeals her convictions following a jury trial in the Boone County Circuit Court ("trial court") for the felony offenses of sexual trafficking of a child in the second degree, endangering the welfare of a child in the first degree, neglect of a child, and rape in the first degree, all of which were perpetrated against her biological daughter ("Victim").[1]  Collins brings four Points on Appeal.  In Point I, Collins contends that the trial court abused its discretion in denying her motion to have Victim declared incompetent to testify and allowing

---

[1] Pursuant to section 595.226, we do not use the name of the victim in this opinion. All statutory citations are to RSMo (2022), unless otherwise stated.

Victim's deposition to be published to the jury in place of her in-court testimony. Collins claims Victim was incompetent to testify under section 491.060, as established by the evidence of Victim's cognitive deficits and level of functioning. In Points II, III, and IV, Collins seeks plain error review regarding the trial court's admission of various hearsay statements made by Victim regarding her allegations of abuse, as admission of those statements violated Collins's right to confront and cross-examine the witnesses against her. Collins argues "the statements were testimonial hearsay and defense counsel had no prior opportunity to cross-examine [Victim], as [Victim] was so mentally incapacitated such that she was incompetent to testify." Because the trial court did not abuse its discretion in denying Collins' motion to declare Victim incompetent to testify, the judgment is affirmed.

## Factual and Procedural History

Collins was indicted by a grand jury on one count of sexual trafficking of a child in the second degree, one count of the class D felony of endangering the welfare of a child in the first degree, one count of the class D felony of abuse or neglect of a child, and one count of rape in the first degree for conduct committed against Victim when she was fifteen years old.[2] Victim has autism and a moderate to severe intellectual disability, and she also suffers from cerebral palsy, club feet, and hearing loss. She was also later diagnosed with post-traumatic stress disorder

---

[2] All charges are found in either Chapter 566 or 568, RSMo, as referred to in n.5, *infra.*

("PTSD") as a result of the incidents described herein. At the time of the charged acts, Victim was residing at an extended-stay hotel with Collins and Collins's boyfriend, whom Victim referred to as "Uncle Bill" ("Uncle Bill" or "Co-Defendant").[3] The charges against Collins stemmed from allegations that she would allow Uncle Bill and other men to have sex with Victim at the hotel in exchange for drugs and money, and that she would inject Victim with "medicine."[4]

Prior to trial, the State filed a motion to admit hearsay statements of a vulnerable person pursuant to section 491.075.[5] The motion gave notice of the

---

[3] Pursuant to section 509.520.1(5), RSMo (2023), we do not provide the names of any non-party witnesses in this opinion. A separate case was brought against Co-Defendant. However, due to the intertwined nature of the prosecutions, defense counsel for Co-Defendant was present at various pre-trial proceedings in Collins's case, including at the deposition at issue on this appeal.

[4] Collins does not challenge the sufficiency of the evidence supporting her convictions.

[5] Section 491.075 provides, in pertinent part:

1. A statement made by a child under the age of fourteen, or a vulnerable person, relating to an offense under chapter 565, 566, 568, or 573, performed by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2)(a) The child or vulnerable person testifies at the proceedings; or

(b) The child or vulnerable person is unavailable as a witness; or

(c) The child or vulnerable person is otherwise physically available as a witness but the court finds that the significant emotional or psychological trauma which would result from testifying in the personal presence of the defendant makes the child or vulnerable person unavailable as a witness at the time of the criminal proceeding.

. . .

State's intent to offer as substantive evidence statements made by Victim to various individuals. Additionally, the State filed a motion for a vulnerable person to testify outside the personal presence of defendant. Said motion requested that Victim be allowed to testify outside the personal presence of Collins "by an in-camera videotaped deposition that may be used as substantive evidence due to the significant emotional or psychological trauma that would result from testifying in the personal presence of the defendant."

A hearing on both motions was held on August 22, 2019. Several witnesses testified for the State regarding Victim's mental development and functioning, as well as her disclosures of abuse. In relevant part, Victim's therapist ("Therapist") testified Victim has a moderate to severe intellectual disability and has been diagnosed with PTSD and autism spectrum disorder. Therapist testified Victim's level of functioning ranges between a kindergartner and a thirteen-year-old, and described her cognitive abilities as being around that of a first-grader or kindergartner. Therapist testified Victim "knows the difference between pretend and real[,]" but "doesn't understand time[,]" explaining that Victim can remember things that happened but may say it occurred last night when, in fact, it occurred last week. Similarly, Therapist testified Victim talks as if others "can read her

---

5. For purposes of this section, "**vulnerable person**" shall mean a person who, as a result of an inadequately developed or impaired intelligence or a psychiatric disorder that materially affects ability to function, lacks the mental capacity to consent, or whose developmental level does not exceed that of an ordinary child of fourteen years of age.

4

mind." She called this concept "theory of mind" and explained "it's normal between the ages of zero to 4, but then we usually grow out of it."

Therapist also explained that due to her autism, Victim "has language delays and communication challenges[.]" She described Victim's language ability as that of an early grade-schooler. Therapist explained that Victim begins to open up more and show a wider range of emotions as trust develops, though it is "a little problematic" because her communication "isn't fully developed[.]" In her time working with Victim, Therapist has seen Victim's academics increase and Victim becoming less hypervigilant, having fewer emotional meltdowns. Therapist also explained Victim "is able to describe more feelings and so [is] a little bit more aware of herself." Therapist believed, however, that Victim would potentially be set back in her progress if she were to testify in front of Collins. She explained it would be emotionally distressing for Victim and "would possibly trigger PTSD, be really confusing for her, and overwhelming. It could possibly have her to shut down."

A similar assessment was made by Victim's previous foster care case manager ("Case Manager"), who stated it would not be in Victim's best interest to testify in front of Collins. More specifically, she explained that "due to [Victim's] cognitive functioning, ethically, I do not think it would be in her best interest to have that flood of traumatic memories come back to her." Similar to Therapist, Case Manager placed Victim's consistent level of functioning at a kindergarten or four-year-old level. Case Manager also placed Victim's language abilities in a

kindergarten age range, "so very child-like, very innocent verbiage[,]" as well as her understanding of time. Case Manager reiterated that Victim was diagnosed with autism and lower cognitive functioning, and she further testified that Victim had been diagnosed with cerebral palsy, has club feet and leg braces, and is fully deaf in one ear and partially deaf in the other.

Case Manager testified that the majority of her time with Victim was spent working on basic life skills. Case Manager explained that Victim requires twenty-four-hour care in the sense that she needs "additional support" "to ensure safety." She testified Victim knew how to brush her teeth and put on deodorant, but required supervision in the shower and help from her foster mom ("Foster Mom") in bathing. She also stated Victim dressing herself "was kind of hit or miss." During her time with Victim, Case Manager saw positive changes in Victim with respect to these skills. Victim could consistently make a sandwich and locate bowls, cups, and plates in the kitchen. She was consistently writing her first name, knew her alphabet, and could count to twenty with minimal confusion. Case Manager also discussed how Victim changed emotionally. She explained that when she first started working with Victim, Victim would tantrum when upset, but throughout the course of their time, that "tantrumming" was no longer seen.

Testimony was also elicited from Victim's foster parents. Both described Victim as "a happy-go-lucky" girl. Regarding Victim's level of functioning, Foster Mom stated the highest level of functioning she has seen from Victim "is probably a five" or "maybe a six, but that's really rare." Victim's foster dad ("Foster Dad")

6

similarly testified that "[s]he's a lot of times six-, seven-year-old state. She may be seventeen years old, but she's . . . like a little girl." Foster Mom testified Victim attends high school, where she has an individualized education plan and goes to special education classes.

As with Therapist and Case Manager, Victim's foster parents noted positive changes in Victim over time. While Victim "needs a lot of care[,]" Foster Mom testified Victim is "[a] different kid" from two years prior when Victim was placed with them. She explained Victim learned how to make a sandwich and use a microwave, knows where items are in the kitchen, and "can put up her clothes where she couldn't do that before." Though Foster Mom still supervises Victim when she showers, Victim "can take a shower" and "knows that has to be done." Foster Mom also testified that Victim has improved cognitively and emotionally "quite a bit." Foster Dad similarly testified "her demeanor is completely changed." He explained that "[s]he is day-to-day completely different, from a three-year-old up to probably a six-year-old" depending on who she is around, but has "improved a lot, how she gets along with everybody."[6]

On August 28, 2019, the trial court issued an order granting the State's motions for Victim to testify outside the personal presence of Collins and to admit Victim's hearsay statements. Collins does not challenge the trial court's rulings on these motions here on appeal.

---

[6] Though not discussed herein, testimony was also given by the two forensic interviewers who had interviewed Victim, as well as the hotel manager of the extended-stay hotel where Victim, Collins, and Co-Defendant resided.

Subsequently, a videotaped deposition of Victim was taken on November 10, 2021, over which the trial court presided. At that time, Victim was twenty years old. The deposition began with the trial court expressing to Victim that he only wanted her to answer questions truthfully and tell the truth. Victim responded to this assertion by stating, "Yes." The trial court asked Victim if she knew what the truth was, to which Victim responded, "No." The trial court then posed a series of questions to Victim regarding the truth of certain statements, which Victim correctly answered. However, when the trial court stated Victim understood "the difference between the truth and what's not the truth," Victim again responded, "No." The court stated, "Well you seem like you did" and then said, "It's not the truth if I say I'm [Victim's name]." Victim correctly responded, "No."

The deposition then transitioned to questioning by the State. The prosecutor began by asking Victim what her first name was, and Victim correctly responded. The prosecutor then asked if Victim remembered the prosecutor's name. Victim initially responded "yes," but then stated she forgot. When asked, Victim accurately provided her birthday, but she incorrectly stated her age. Victim was then asked other questions regarding days of the week and numbers, and she had similar difficulties in answering. Victim understood where she was, in a courtroom, though she did not know what the building itself was called.

The prosecutor asked if someone brought Victim to the courthouse that day, to which Victim responded her "dad," referring to Foster Dad. Victim stated she lived with Foster Dad, her "mom," which was Foster Mom, and other children.

8

When asked how many bedrooms were in her house, Victim responded "three houses and four houses," but then affirmed that she sleeps in a room at night.

As noted, the concept of time proved difficult for Victim. The prosecutor asked how long Victim had lived with her foster family, to which Victim responded "twelve hours ago." Victim similarly answered "twelve hours" when asked if she remembered what year she moved in with her foster family. Victim did not know how old she was when she began living with her foster family. When asked if she remembered where she lived before living with her foster family, Victim initially responded "twelve ago" and then "three or four hours" when asked again.

The prosecutor asked if Victim remembered "a lady by the name of [Hotel Manager] who worked at the hotel?" Victim responded, "No. I don't know where [Hotel Manager] is," but when asked again if she remembered knowing a woman by that name, Victim nodded yes. Victim stated "we're best friends together" and remembered talking and playing games with her. The prosecutor then asked Victim if she remembered someone named "Uncle Bill." After some difficulty, Victim responded that was her "dad's mom's boyfriend." The prosecutor asked if Victim was talking about someone named "Renee" when talking about "that mom," to which Victim stated, "Yeah. My – my real mom." Victim confirmed that the boyfriend of her "real mom," Collins, was Uncle Bill.

Having now understood which "mom" was being discussed, Victim stated she remembered living with her "real mom" at a hotel "a long long time ago." She also stated that she knew Collins's boyfriend Uncle Bill at that time and that she

9

did not like him. When asked why she did not like Uncle Bill, Victim stated he hurt her "really really bad," explaining that he hit her in her face while she was playing a game with a friend. When asked if Uncle Bill did anything else that made Victim not like him, she responded that he "punched [her] in [her] arm." Victim also stated Uncle Bill "hit [her] leg too." When asked if Uncle Bill did anything else that made her not like him, Victim responded "no."

Victim remembered getting "medicine" from Collins, stating it "taste gross" and "taste like bubble gum." She said the medicine was in her "mouth" and that Collins did not give her any other kind of medicine. Victim stated this occurred while she was living at the hotel. When asked if she liked living at the hotel, Victim responded, "No I don't." When asked why she did not like living there, Victim replied that Uncle Bill hit her mom in the face while Victim was playing a game with her. Victim also stated he knocked her mom's glasses off and punched her mom's arm. The prosecutor then asked if Uncle Bill did anything to Victim that she did not like, and Victim again answered that he hit her in her arm, knee, and leg. Victim responded "no" when asked if there was any other part of her body that he hurt.

The prosecutor then asked Victim if she had ever received medicine in her arm. She stated she had never received any other kind of medicine other than a flu shot. The prosecutor then asked Victim if anyone else lived with her in the room with Collins, and Victim responded "no." Victim stated her "caseworker" would visit that room, and that there were never visitors to the room that she did not

know. The prosecutor ended her questioning by asking if there were any questions asked that Victim did not understand, and if there was anything Victim had not told her that happened at the hotel that was not asked about. Victim responded "no" to both questions.

Questioning by defense counsel[7] then commenced. Victim was asked who "L.B." was and she replied that she did not know. However, after being shown a photo of "L.B.," Victim stated she knew him, recognizing him as her "mom's boyfriend." At first, Victim did not remember his name nor did she remember calling him "L.B.," but she did remember living with him and playing with him, even stating that they were friends. Later, however, Victim spontaneously stated "his name is Uncle Bill," referring to the man in the picture. She confirmed it was the same Uncle Bill that she had said hit her in the arm.

Victim also stated she was friends with Hotel Manager and generally described their relationship. Victim then confirmed who she lives with currently. Defense counsel then asked if a "Richard" currently or ever lived with her, and Victim responded no. Victim was also asked if she ever played pretend, to which she replied "sometimes." She said she "sometimes" plays with pretend friends and they "sometimes" have pretend names.

Victim also stated that she did not like taking medicine and that she "sometimes" got a flu shot. When asked if she "got shot" more than once, Victim

---

[7] Victim was questioned first by Co-Defendant's defense counsel, then Collins's defense counsel.

11

responded, "Yeah sometimes." Victim also replied "sometimes" when asked if the medicine her mom wanted her to take was in Victim's mouth and tasted like gross bubblegum. Victim stated the last time she saw Collins was three or four "week ago" at "the motel." She stated they talked, but did not remember what about. The defense then rested. No questions were directed to Victim regarding the criminal events.

On June 8, 2022, Collins filed a "Motion to Declare Witness Incompetent to Testify and Exclude Previously Admitted 491 Evidence." Said motion requested the trial court to rule Victim incompetent to testify pursuant to section 491.060(1), and consequently exclude her previously taken in-court testimony, as well as any and all previously admitted out-of-court statements by Victim. Collins specifically argued that at the time of her videotaped testimony on November 10, 2021, Victim "demonstrated she was clearly unable to competently testify, being unable to even acknowledge the difference between a truth and a lie, among exhibiting other clear deficiencies regarding time, place, and ability to recollect." Collins argued further that if the court were to rule Victim incompetent to testify, "any statements previously ruled admissible pursuant to [section] 491.075 must hereby be excluded[,]" as the requirements of said statute "will not be met." The State responded, arguing Victim met the competency requirements as set forth in *State*

12

*v. Robinson*, 835 S.W.2d 303 (Mo. banc 1992), such that she is not "mentally incapacitated" as is required to be deemed incompetent under section 491.060(1).[8]

The parties agreed to submit the issue on the pleadings. Thereafter, in a docket entry "Order" dated July 12, 2022, the trial court denied Collins's motion to declare Victim incompetent to testify, to wit:

> [T]he Court, having presided over the deposition of the witness in issue, and having reviewed the pleadings and relevant legal authority, denies the Motion to Declare Witness Incompetent to Testify. The Court finds that the witness demonstrated an understanding of the obligation to speak the truth; the capacity to observe; the capacity to remember; and the capacity to translate the observations into words. State v. Robinson, 835 S.W.2d 303 (Mo. banc 1992). Having observed the witness' live testimony firsthand, the Court finds that defendants' Motions go to the weight rather than the admissibility of the witness' testimony. Even assuming for the sake of discussion that the witness were "incompetent," the Court finds in the alternative and agrees with the State that the witness' testimony would still be admissible under [section] 491.060(2) considering the witness' estimated developmental age. For these reasons, the Court denies defendants' Motions.

During the trial, the State published Victim's videotaped deposition to the jury over defense counsel's objection. Victim's forensic interviews were also admitted into evidence, and several witnesses testified regarding Victim's disclosures of abuse.

The jury found Collins guilty as charged, and sentenced her to a twenty-five-year term of imprisonment for the count of second-degree sexual trafficking, a

---

[8] In the alternative, the State argued Victim would fall under the exception outlined in section 491.060(2), as her estimated developmental age "largely falls under the age of ten" and she is the alleged victim of chapter 566 and 568 offenses. Lastly, regarding Victim's out-of-court statements, the State asserted they would be admissible under section 491.075 irrespective of her competency to testify. Due to our holding herein, these claims need not be discussed.

seven-year term of imprisonment for the count of endangering the welfare of a child, a seven-year term of imprisonment for the count of neglect of a child, and a twenty-five-year term of imprisonment for the count of first-degree rape. Collins filed timely post-trial motions which were overruled, after which the trial court ordered the sentences to be served consecutively to each other, resulting in a total sentence of sixty-four years.

Collins appeals. She raises four Points on Appeal, the first of which is dispositive.

**Standard of Review**

"Determination of competency of a witness to give testimony is for the discretion of the trial court and will not be reversed except for clear abuse." *Robinson*, 835 S.W.2d at 307 (citing *State v. Feltrop*, 803 S.W.2d 1, 10 (Mo. banc 1991), *overruled on other grounds by Joy v. Morrison*, 254 S.W.3d 885, 889 (Mo. banc 2008); *State v. Robertson*, 480 S.W.2d 845, 846 (Mo. 1972)). "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Rauch*, 118 S.W.3d 263, 275 (Mo. App. W.D. 2003) (citing *Redfield v. Beverly Health & Rehab. Servs. Inc.*, 42 S.W.3d 703, 711 (Mo. App. E.D. 2001), *overruled on other grounds by Sides v. St. Anthony's Med. Ctr.*, 258 S.W.3d 811, 813 (Mo. banc 2008)). "Historically, the appellate courts of this state have been quite deferential to trial

court rulings on the competence of mentally disabled witnesses." *Id.* at 273 n.11 (collecting cases).

## Analysis

In her first Point on Appeal, Collins claims the trial court abused its discretion when it denied her motion to have Victim declared incompetent to testify and allowed Victim's deposition to be published to the jury in lieu of her in-court testimony. Collins asserts this violated section 491.060, her right to confront the witnesses against her, and her due process right to a fair trial, as "evidence regarding [Victim's] cognitive deficits and level of functioning clearly established [Victim] lacked the mental capacity to tell the difference between truth and falsity, observe or remember the occurrence about which she testified, or accurately communicate what she observed or remembered about the occurrence about which she testified[,]" therefore rendering Victim incompetent to testify under section 491.060. Collins argues further that she was prejudiced, because had the trial court declared Victim incompetent to testify, Collins "could not confront [Victim] on her testimonial hearsay statements that were admitted into evidence, and as such, these statements would not have been admitted and . . . Collins would not have been convicted of the offenses for which these statements provided the bulk of the evidence."

"Missouri presumes that a witness is competent to testify, except for a few statutory exceptions including mental incapacity." *Robinson*, 835 S.W.2d at 307

15

(citing section 491.060(1) RSMo 1986; *McCrary v. Ogden*, 267 S.W.2d 670, 672 (Mo. 1954)).  Indeed, section 491.060 provides, in relevant part:

> The following persons shall be incompetent to testify:
>
> (1) A person who is mentally incapacitated at the time of his or her production for examination;
>
> (2) A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which the child is examined, or of relating them truly; provided, however, that except as provided in subdivision (1) of this section, a child under the age of ten who is alleged to be a victim of an offense pursuant to chapter 565, 566 or 568 shall be considered a competent witness and shall be allowed to testify without qualification in any judicial proceeding involving such alleged offense.  The trier of fact shall be permitted to determine the weight and credibility to be given to the testimony[.]

As can be seen, section 491.060(1) is concerned with a person's mental capacity *at the time of her production for examination*.  In this case, the time of Victim's production for examination was her videotaped deposition.  Therefore, the question before us is whether Victim was mentally incapacitated at the time of her deposition.

Importantly, for a witness to be deemed incompetent to testify under section 491.060(1), the "witness must exhibit some mental infirmity *and* fail to meet the traditional criteria for witness competence." *State v. Beine*, 730 S.W.2d 304, 307-08 (Mo. App. E.D. 1987).  Under these traditional criteria for witness competence,

> A witness is competent to testify if the witness shows "(1) a present understanding of, or the ability to understand upon instruction, the obligation to speak the truth; (2) the capacity to observe the occurrence about which testimony is sought; (3) the capacity to remember the occurrence about which testimony is sought; and (4) the capacity to translate the occurrence into words."

16

*Robinson*, 835 S.W.2d at 307 (quoting *Feltrop*, 803 S.W.2d at 10). "A witness who has not been adjudicated of unsound mind[9] and is not presently confined to a mental institution, is presumed competent." *State v. Newton*, 963 S.W.2d 295, 297 (Mo. App. E.D. 1997) (citing *State v. Darty*, 619 S.W.2d 750, 751 (Mo. App. E.D. 1981)). Under those circumstances, "the burden of showing the witness to be of unsound mind and incompetent to testify is upon the one who seeks to exclude the witness's testimony on that ground." *State v. Stufflebean*, 604 S.W.2d 737, 741 (Mo. App. W.D. 1980) (citing *State v. McCarty*, 460 S.W.2d 630, 637 (Mo. 1970)); *see also McCrary*, 267 S.W.2d at 672.

Here, there is no evidence that Victim has ever been adjudicated mentally incompetent or is presently confined in a mental institution. As such, she is presumed competent, and the burden to demonstrate otherwise is upon Collins. There is no dispute, however, that Victim suffers from some level of mental infirmity. This was established through the evidence pertaining to her intellectual disability, her estimated developmental age, and her diagnoses of autism and PTSD. Nevertheless, Collins must *also* show that Victim failed to meet the four traditional criteria for witness competence at the time of her videotaped deposition. As demonstrated by the evidence, Collins cannot meet this burden.

---

9 Previously, section 491.060(1) referred to persons of "unsound mind." *Beine*, 730 S.W.3d at 307 n.2. In 1983, this language was changed to "mentally incapacitated." *Id*.; *State v. Newton*, 963 S.W.2d 295, 297 (Mo. App. E.D. 1997). Regardless, what is of importance here is that a person is presumed competent, and the burden is upon the party seeking to exclude the testimony to prove such person's incompetence.

First, it was apparent at the deposition that Victim had "a present understanding of, or the ability to understand upon instruction, the obligation to speak the truth[.]" *Robinson*, 835 S.W.2d at 307 (quoting *Feltrop*, 803 S.W.2d at 10). Of significance is the fact that this particular evaluation was conducted by the trial court. At the outset of the deposition, the trial court made clear that Victim was to answer questions truthfully and tell the truth. Victim demonstrated her understanding of this directive by answering "Yes." This understanding was further seen through Victim's correct responses to questions posed by the trial court regarding the truth of various statements. Though Victim stated twice that she did not know what the truth was, her answers to the trial court's follow-up questions clearly indicated she understood the concept of the truth and her obligation to speak truthfully.[10] Here, her answers mirrored the level of understanding she possessed, as stated by her Counselor and Therapist. It is apparent Victim has difficulty with abstract concepts but understands concrete details.

Notably, at no time during the deposition did defense counsel question Victim further on her understanding of the truth. Despite this, Collins now attempts to cast doubt on Victim's understanding by pointing to various instances throughout the deposition where Victim would answer a question one way, then later provide a different or contradictory answer. Collins asserts that these are

[10] This understanding was further reinforced by Therapist's testimony that Victim knows the difference between real and pretend.

instances where Victim made "false statements." This is an unfair characterization. Rather, it is evident that as the deposition progressed, so did Victim's understanding of the subjects about which were being asked. Again, as stated by Victim's Therapist, Victim answers as if others "can read her mind," i.e., the "theory of mind" concept. As further clarification was gained of what she was describing, the dialog between Victim and the attorneys naturally evolved, as did the understanding of Victim's answers. By way of example, Victim was asked about her "mom," yet her answers *and the following questions by counsel* became clearer once Victim understood the "mom questions" referred to her "real mom."

Additionally, no indication was given at any time during the deposition that Victim was pretending to know something that in reality she did not know. In fact, the opposite was demonstrated, including when Victim admitted that she forgot the prosecutor's name after initially stating she did remember. Thus, in the context of the entire deposition, these referenced instances are not indicative of untruthfulness.

Collins also references testimony by the forensic interviewer who interviewed Victim in order to demonstrate Victim's inability to understand the obligation to tell the truth. We note two issues with Collins's use of this testimony. First, the forensic interviewer offered testimony in relation to her interviews of Victim in 2018. Our analysis is focused on Victim's competency *at the time she was produced for examination*, her deposition, which took place three years after said interviews. Second, Collins forgets that Victim's statements to the forensic

19

interviewer were found to be reliable when the trial court granted the State's pre-trial motion to admit Victim's hearsay statements. Significantly, in granting that motion, the trial court found:

> There was no evidence adduced to indicate that [Victim] had a reason to fabricate the statements or that [Victim] did not understand the difference between a truth and a falsehood. In response to certain questions during the forensic interviews, for example, [Victim] through her answers demonstrated repeatedly – and, at times, emphatically – that she understood the difference between what was true and what was false.

Collins does not challenge this ruling by the trial court. We are therefore unpersuaded by Collins's arguments that Victim did not demonstrate an understanding of, or have the ability to understand, her obligation to speak the truth.

Nor are we convinced that Collins has demonstrated Victim did not have "the capacity to observe the occurrence about which testimony is sought[.]" *Robinson*, 835 S.W.2d at 307 (quoting *Feltrop*, 803 S.W.2d at 10). Collins points to various testimony as evidencing Victim's inability to meet this specific criterion, including, but not limited to, Therapist's testimony that Victim "doesn't understand time" and does not have a correctly developed "theory of mind"; Victim stating past events occurred mere "hours" ago; Victim referring to bedrooms as "houses"; Victim jumping from ten to 100 when asked to count as high as she could; and Victim listing months when asked if she knew the days of the week and

then failing to list every day when asked again.[11] Collins asserts this all demonstrates Victim's inability to accurately perceive events. We disagree.

We first note that our Supreme Court has upheld a finding of competency under section 491.060 in the face of similar testimony. *See McCrary*, 267 S.W.2d at 672-73 (finding defendants failed to show witness was of unsound mind, even though the witness "did not know the day of the week on which he was then testifying"; "he didn't know the date; he thought he had been in the state hospital until about two months prior to the trial, when, in fact, it had been over two years; he said 3 plus 2 was 6; and . . . he thought Roosevelt was then (1953) President"). As the trial court aptly found, much of the testimony cited by Collins goes more towards Victim's credibility than her competency. *See id.* at 673-74.

Moreover, Collins conveniently overlooks testimony from Victim which *does* indicate her capacity to observe events. Indeed, Victim testified that she lived with Collins at a hotel "a long long time ago." Victim also testified that Uncle Bill was Collins's boyfriend and that she knew Uncle Bill while living with Collins. Victim identified Uncle Bill from a photograph and testified that she did not like him. She explained Uncle Bill hurt her "really really bad" and described acts of physical abuse perpetrated against her by Uncle Bill. Victim testified that she did not like living at the hotel because of Uncle Bill's abuse against her and Collins. Victim

---

[11] Collins again cites testimony from the forensic interviewer in support. However, as discussed with the first criterion, we are focused on Victim's competency at the time of the deposition and further note that Victim's statements to forensic interviewer were found reliable by the trial court.

further testified that while living at the hotel, she received "medicine" from Collins. Thus, we are not persuaded that the trial court abused its discretion in holding Victim demonstrated the capacity to observe.

For similar reasons, we find Collins has also failed to show Victim lacked "the capacity to remember the occurrence about which testimony is sought[.]" *Robinson*, 835 S.W.2d at 307 (quoting *Feltrop*, 803 S.W.2d at 10). Collins again points to testimony pertaining to Victim's ability to understand time and space, as well as inconsistencies in Victim's testimony, in arguing Victim did not meet this criterion. As just explained, however, Collins is referencing matters affecting Victim's credibility, which goes "to the weight to be given [her] testimony by the jury." *McCrary*, 267 S.W.2d at 674. While Victim required some "cueing" and clarification from the questioner, she was able to recall details about Uncle Bill and her time living with Collins at the hotel. Any inconsistencies therein were matters to be explored on cross-examination and considered by the jury. The trial court did not abuse its discretion in finding Victim demonstrated the capacity to remember.

Further, Collins's targeting of Victim's difficulty in assessing time and space fails to address what was significant in terms of the charges at hand. This was not a case in which Victim's age at the time she was sexually assaulted was of significance such that knowing exactly when the assault occurred must be determined. Similarly, a statute of limitations issue was not raised regarding the underlying charges which would lead to a specific date being of utmost importance.

22

Accordingly, knowing *when* in time and space it occurred is not the crux of the matter, but rather *what* occurred is of importance. Her challenges with time and space are dramatically less significant with this in mind.

Lastly, Collins has not demonstrated that Victim lacked "the capacity to translate the occurrence into words." *Robinson*, 835 S.W.2d at 307 (quoting *Feltrop*, 803 S.W.2d at 10). In arguing Victim did not have this capacity, Collins points first to the various testimony regarding Victim's level of functioning, diagnoses, and cognitive abilities, as well as how they affect her ability to communicate.[12] However, Victim's various conditions, *by themselves*, do not establish that she lacked the capacity to communicate events. *See Beine*, 730 S.W.2d at 307-08 ("[A] witness must exhibit some mental infirmity *and* fail to meet the traditional criteria for witness competence."); *State v. Dighera*, 617 S.W.2d 524, 527 (Mo. App. W.D. 1981) ("That the witness was bereft of sound, speech and sight did not affect her competency as a witness, when she was able to communicate by fingerspelling language through an interpreter and otherwise had capacity to notice, recollect and communicate the events in controversy." (citations omitted)).

Otherwise, Collins only reiterates that Victim "contradict[ed] herself" throughout the deposition, and asserts that Victim "was largely led by the State's questions to answers the State clearly desired . . . ." These arguments fail to convince us that Victim lacked the capacity to communicate events into words. As

---

[12] *See supra* note 11.

23

we have repeated herein, any contradictions in Victim's testimony is a matter of credibility left to the province of the jury. Additionally, while Collins claims Victim's answers were largely influenced by the State's leading questions, she fails to provide any examples of such questioning.

Regardless, we find this argument to be another unfair characterization of Victim's deposition testimony. In viewing the deposition in its entirety, it is evident that Victim was engaged and responsive throughout. Even though she sometimes required "cueing," clarification, or repeated questions, Victim clearly thought about the question before answering and then communicated her answers, both in actions and words, in a way consistent with her estimated level of functioning. We therefore find that the trial court did not abuse its discretion in finding Victim demonstrated the capacity to translate the occurrence into words.

Having found Collins has failed to demonstrate that Victim did not meet each of the four traditional criteria for witness competence at the time of her deposition, we find Collins has also failed to demonstrate that Victim was "mentally incapacitated" under section 491.060(1). Accordingly, Collins has failed to sustain her burden to find Victim incompetent to testify. We therefore hold the trial court did not abuse its discretion in denying Collins's motion to have Victim declared incompetent to testify and in publishing Victim's deposition to the jury. Point I is therefore denied.[13]

---

[13] Due to this holding, we need not address Collins's additional arguments in Point I regarding the trial court's alternative finding as to section 491.060(2).

Because of our holding in Point I, it is unnecessary to review Collins's remaining Points on Appeal. Said Points depend on a finding that Victim was so mentally incapacitated as to prevent Collins from meaningfully cross-examining her on her admitted hearsay statements. Considering that Collins failed in her burden to demonstrate Victim was so mentally incapacitated as to be deemed incompetent, her remaining contentions must also fail. *See State v. Potter*, 747 S.W.2d 300, 306 (Mo. App. S.D. 1988) ("Because the premise that H.P. was incapacitated fails, the conclusion that defendant was denied the right to confront and cross-examine her must fail.").

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.